786 A.2d 203

COMMONWEALTH of Pennsylvania, Appellee,

v.

Michael PIERCE, Appellant.

Supreme Court of Pennsylvania.

Submitted April 5, 2000.

Decided Dec. 21, 2001.

Michael Pierce, pro se.

Ramy I. Djerassi, Philadelphia, for Michael Pierce as stand-by counsel.

Catherine Marshall, Philadelphia, for Commonwealth.

Robert A. Graci, Harrisburg, for Office of Attorney General.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

NEWMAN, Justice.

Michael Pierce (Appellant) appeals, *pro se*, from the denial of his first petition for post-conviction relief, pursuant to the Post Conviction Relief Act (PCRA).[1] We affirm.

## I. *FACTUAL AND PROCEDURAL HISTORY*

We described the facts of Appellant's convictions for three counts of first-degree murder and related charges in our opinion on direct review as follows:

The evidence presented in the instant case established that at approximately 3:00 a.m. on the morning of July 10, 1989, Joan Pierce, the appellant's sister, was awakened by the strong smell of gasoline. Joan woke her father, George Pierce, and the two of them descended the stairs to discover the living room sofa on fire. George Pierce opened the

1. 42 Pa.C.S. §§ 9541–9546.

basement door and flames then shot forth, forcing them to flee the house. George reentered the house in an attempt to rescue his wife and mother-in-law. George was unable to reach the stairs and collapsed inside. He was pulled out of the flaming building by neighbors who had been awakened by the fire.

George was taken from the scene to a hospital where he was treated for burns and smoke inhalation. Eventually he was transferred to a nursing home where he died six months later from complications due to smoke inhalation and bronchopneumonia. Appellant's mother, Mary Pierce and her ninety-five-year old mother, Anna Hayes, were pronounced dead at the scene, with the cause of death later determined to be smoke and soot inhalation.

Upon investigation, experts from the Philadelphia fire department determined that the house burned down as a result of two separate fires, each having been deliberately set. The minor cause of the fire was found to have been deliberately caused by an open flame being struck to the sofa. The major cause of the fire was found to have occurred in the basement by use of an accelerant. In the opinion of the fire department expert, a plastic anti-freeze bottle found on the basement floor had been filled with gasoline and deliberately set ablaze. In the opinion of the fire department investigator, the fire was the result of arson. The Pierce home was located at 3011 Byberry Road in Philadelphia and was physically located within a row of attached houses.

Sharon DeFazio, a neighbor, testified that she recognized the anti-freeze bottle as identical to the one George Pierce used as a container for gasoline for his lawnmower. Ms. DeFazio testified that Mr. Pierce had, shortly before the fire, given her a similar bottle filled with gasoline for her lawnmower, explaining that it was a safer container in which to keep gasoline. Ms. DeFazio also knew where in his garage Mr. Pierce had kept his anti-freeze bottle containing gasoline. After the fire, the anti-freeze bottle containing gasoline was not found in the Pierce garage.

In the garden behind the Pierce home a partial impression of a shoe print was discovered. Soil samples taken from the impression matched soil samples taken from the boots the appellant was wearing on the morning of the fire. A short distance away from and to the rear of the Pierce home, in an area of abandoned buildings, police discovered a partially used book of matches. The same type of matchbooks [sic] were found in a box of matchbooks at the home of Tim O'Reilly, where the appellant had been staying the week preceding the fire. The area containing the abandoned buildings was surrounded by a fence. On the top rail of the fence police discovered a soil sample which matched with the samples taken from the impression in the garden of the Pierce home and the sample from the appellant's boots.

At the time the fire was raging two teen-age boys were in the vicinity. The boys, Harry Espanshade [sic] and Randy Zehnder, approached two officers who were in the area on an unrelated matter and told them of the fire. The boys then began to walk through the woods towards the fire. As they were proceeding towards the fire, they saw a man running away from the fire wearing jeans and a flannel shirt over a dark T-shirt. The boys immediately gave the police a description of the man. A few minutes later they again saw the man, this time without the flannel shirt. Two hours later while at the scene of the fire the boys saw the same man walking up the street toward the Pierce home. They identified him as the appellant.

Police Sergeant Shanfield was one of the officers who had been notified of the fire by Harry and Randy. As he was driving towards the Pierce house a man crossed in front of his car and ran into the woods. As the man was running Sergeant Shanfield observed him stumble. Two and one-half hours later the Sergeant saw appellant at the police station and recognized him as the man he had seen running into the woods earlier. After appellant was arrested, he was treated at the Philadelphia county prison for an injury to his toe.

Joan Pierce, appellant's sister, testified that her parents and appellant had a very strained relationship. Appellant had accused his parents of putting steroids in his food and depriving him of an inheritance from his Uncle Al. One week prior to the fire George and Mary had asked appellant to leave the family residence. Appellant had told Joan on many occasions that he hated their parents and threatened to kill them. Joan had seen appellant on Sunday night before the fire; he was wearing jeans, a dark T-shirt and a red flannel shirt and boots.

The week before the fire appellant had been living with his friend Tim O'Reilly and Tim's mother across the street from his parents' home. Mrs. O'Reilly testified that during that week appellant had told her that he would have no peace while his parents were alive. Appellant told Mrs. O'Reilly that he would get away with murdering his parents and would flee to Indonesia. Mrs. O'Reilly related this conversation to Joan Pierce.

Tim O'Reilly testified that during the week appellant stayed in his home, appellant repeatedly expressed the intent to kill his parents. Appellant told Tim of his intent to burn down the Pierce home and either commit suicide or escape to Indonesia. Appellant referred to his parents as "the enemy." Appellant explained that he would break his grandmother's neck so she wouldn't have to suffer, or be placed in a nursing home.

Appellant had a disagreement with Tim's mother and decided to leave the O'Reilly home the Sunday before the fire. Appellant left Tim's house about 11:00 p.m. Sunday night before the fire. At that time he was wearing a dark blue or green T-shirt, jeans and boots, and carrying a black and red flannel shirt Tim had given him.

At approximately 3:25 a.m. on the morning following appellant's departure from the O'Reilly home, Tim was in his kitchen when he noticed lights on in the Pierce garage and observed the garage door partially opened. About ten minutes later the lights went out and he heard a thud and then saw the garage door was closed. Two minutes thereaf-

ter he saw the fire erupt in the Pierce home. Tim called the police and went outside to help with the fire.

Appellant was arrested later that morning when he was observed walking towards the Pierce home.

*Commonwealth v. Pierce*, 537 Pa. 514, 645 A.2d 189, 192–94 (1994).

At the conclusion of Appellant's trial on October 30, 1990, a jury convicted Appellant of three counts of first-degree murder, arson, aggravated assault, recklessly endangering another person, and risking a catastrophe. Following a one-day penalty hearing, the jury sentenced Appellant to three concurrent death sentences for each first degree murder conviction, finding that the two aggravating circumstances, 42 Pa.C.S. § 9711(d)(6) (killing while in the perpetration of a felony) and 42 Pa.C.S. § 9711(d)(7) (knowingly creating grave risk of death to another), outweighed the one mitigating factor, 42 Pa.C.S. § 9711(e)(1) (no significant history of prior criminal convictions). Appellant obtained new counsel and filed post-verdict motions alleging trial counsel's ineffectiveness. The trial court denied these motions. On direct appeal, we affirmed Appellant's Judgment of Sentence. *See Pierce, supra.*

The present proceedings commenced when Appellant filed a *pro se* PCRA petition on October 5, 1994. The PCRA court appointed counsel, who filed an Amended Motion for Post Conviction Collateral Relief on June 28, 1995. Appellant, through his then counsel, Bernard Siegel, Esquire, filed a Supplement to Amended Motion for Post Conviction Collateral Relief on January 23, 1997 and a Second Supplement to Amended Motion for Post Conviction Relief on November 12, 1997. The PCRA court held multiple hearings regarding the status of Appellant's petition and his counsel's request that Appellant undergo psychiatric or psychological evaluation to explore potential PCRA issues concerning the effectiveness of prior counsel in developing mental health mitigation evidence during the penalty phase of Appellant's trial. The PCRA court permitted Appellant to retain a psychologist and held a hearing on July 30, 1997, at which Appellant was present and stated on the record his refusal to undergo psychological

evaluation.[2] Because Appellant refused to cooperate with the presentation of any potential issues regarding the effectiveness of counsel in investigating possible mental health mitigation evidence, the PCRA court determined that no further evidentiary hearing was needed on Appellant's remaining PCRA claims and dismissed Appellant's petition on December 9, 1997.

Appellant filed a Notice of Appeal to this Court on December 19, 1997 and an Amended Notice of Appeal on January 8, 1998. Appellant's first PCRA counsel, Mr. Siegel, petitioned to withdraw as counsel on May 27, 1998, because his relationship with Appellant had become "substantially hostile" and "unworkable" and because Appellant wished to raise issues regarding Mr. Siegel's effectiveness as PCRA counsel. This Court granted Mr. Siegel's request to withdraw on September 10, 1998, and remanded for the PCRA court to appoint new counsel. The PCRA court appointed Norris Gelman, Esquire, to handle the appeal. On March 17, 1999; Mr. Gelman moved for leave to withdraw as counsel, citing "irreconcilable differences" and specifically noting Appellant's request that he withdraw as counsel. On July 1, 1999, we granted Mr. Gelman's motion to withdraw and remanded for the PCRA court to appoint, for the second time, new counsel for Appellant. The trial court appointed Jules Epstein, Esquire, as Appellant's third PCRA counsel; however on September 14, 1999, Appellant filed an Application for Withdrawal of Briefing Schedule and Remand for Hearing on Appellant's Request to Proceed *Pro Se.* On October 13, 1999, we remanded to the PCRA court for a hearing on Appellant's request to proceed *pro se* on his appeal and whether the court should appoint standby counsel. Pursuant to our directive, the PCRA court

2. At the July 30, 1997 hearing, counsel explained that Appellant refused to undergo any psychiatric evaluation for the purpose of developing claims related to the presentation of his penalty-phase mitigation case because Appellant wished to limit his challenge to obtaining a new trial. Notes of Hearing 7/30/97 p. 5. Appellant confirmed this and also expressed to counsel his belief that overturning his death sentence without simultaneously obtaining a new trial would hamper his efforts to obtain federal habeas corpus review of his convictions. *Id.* at pp. 13 14, 31.

conducted a hearing on November 10, 1999, where both Appellant and Mr. Epstein were present. At this hearing, the court questioned Appellant to determine whether he knowingly, voluntarily, and intelligently wished to waive his right to counsel and proceed *pro se,* and concluded that Appellant understood the consequences of his request and had made an effective waiver of his right to counsel.[3] Accordingly, the court granted Appellant's request to proceed *pro se,* permitted Mr. Epstein to withdraw as counsel, and appointed Ramy Djerassi, Esquire, as standby counsel for the limited purpose of assisting Appellant to comply with the procedural rules governing the filing of appellate briefs. Consequently, we must address Appellant's *pro se* appeal.

## II. *DISCUSSION*

Appellant presents claims of ineffective assistance of appellate counsel that were raised by PCRA counsel and claims of ineffective assistance of PCRA counsel for failing to raise issues that Appellant sought to have reviewed.

To be eligible for relief under the PCRA,[1] Appellant must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from one of the grounds for relief provided in Section 9543. Appellant must also show that none of the claims raised in his petition has been previously

---

**3.** Appellant offered the following explanation for his request to proceed *pro se:*

The answer to that question is, I wish to proceed *pro se,* if I may. It is mainly because, not on Mr. Epstein's part so far, but all the prior counsel refused to raise issues or even give me legal reasoning why they could not raise issues I have given to them, right, and I'm going around in circles because I filed three habeas corpuses and the Federal Court is still saying I'm not exhausting the state remedies, and I figured the only way I'm going to get these issues raised so I can get out of this loop I'm in is to go *pro se.*

Notes of Hearing 11/10/99 pp. 6–7.

**4.** Because Appellant filed his petition in October of 1994, the 1995 amendments to the PCRA do not govern this petition. Consequently, the 1988 version of the PCRA applies. *See* Section 3(1) of Act 1995 (Spec.Sess. No. 1), Nov. 17, P.L. 1118, No. 32.

litigated or waived.[5] Because all of Appellant's assignations of trial court error and claims of ineffective assistance of trial counsel could have been raised in his post-verdict motions or on direct appeal, those claims are waived.[6] However, the present claims of Appellant relate either to the ineffectiveness of appellate counsel for failing to raise issues on direct appeal, which were included in the PCRA petition, or to the ineffectiveness of PCRA counsel for failing to raise issues of prior counsel's ineffectiveness, which Appellant brings for the first time to this Court. Properly layered ineffective assistance of counsel claims avoid the waiver provisions of the PCRA. *Commonwealth v. Pursell,* 555 Pa. 233, 724 A.2d 293, 302, *cert. denied,* 528 U.S. 975, 120 S.Ct. 422, 145 L.Ed.2d 330 (1999). Further, Section 9543(a)(2) of the 1988 version of the PCRA provided relief for claims of "ineffectiveness assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii) (1988 version). Consequently, to the extent that Appellant has raised properly layered claims of ineffective assistance of counsel that were not previously litigated, Appellant is entitled to review of those claims.

5. The version of Section 9543(a)(3) applicable to Appellant's petition required a petitioner to prove:

(3) That the allegation of error has not been previously litigated and one of the following applies:

(i) The allegation of error has not been waived.

(ii) If the allegation of error has been waived, the alleged error has resulted in the conviction or affirmance of sentence of an innocent individual.

(iii) If the allegation of error has been waived, the waiver of the allegation of error during pretrial, trial, post-trial or direct appeal proceedings does not constitute a State procedural default barring Federal habeas corpus relief.

42 Pa.C.S. § 9543(a)(3) (1988 version).

6. Section 9544(b) provided:

(b) Issues waived.—For the purposes of this subchapter, an issue is waived if the petitioner failed to raise it and if it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or other proceeding actually conducted or in a prior proceeding actually initiated under this subchapter.

42 Pa.C.S. § 9544(b) (1988 version).

 The standard for proving ineffective assistance of counsel is well settled. Appellant must prove: (1) that the underlying claim is of arguable merit; (2) that counsel's performance lacked a reasonable basis; and (3) that the ineffectiveness of counsel caused him prejudice. *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592, 598 (2000). Prejudice in the context of ineffective assistance of counsel means demonstrating that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 332 (1999). This standard is the same in the PCRA context as when claims of ineffective assistance of counsel are raised on direct review. *Id.*

### A. *Claims of Ineffective Assistance of Appellate Counsel*

#### 1. *Failure to Challenge Jury Instruction*

In his Amended PCRA petition, Appellant alleged appellate counsel's ineffectiveness for failing to challenge on appeal the trial court's jury instruction regarding murder:

It will be your duty in this case to determine whether George Pierce, Mary Pierce, and Anna Hayes died as a result of injuries sustained in a fire which was started by this defendant and, if so, whether such killing amounted to murder of the first degree, murder of the second degree, murder of the third degree, voluntary manslaughter, or involuntary manslaughter.

You cannot find the defendant—you cannot find that the defendant killed any of these persons unless you are satisfied beyond a reasonable doubt that the defendant's conduct was the direct cause of their death.

N.T. 10/31/90 p. 899. Appellant objects to the phrase "in a fire which was started by this defendant" and contends that this language compelled the jury to accept as an established fact that Appellant caused the victims' deaths by arson, thus taking away this fact-finding function from the jury.

 We disagree. It is axiomatic that a jury charge must be read in its entirety to determine whether it is fair or

prejudicial and that the trial court has broad discretion in phrasing its instructions so long as the law is clearly, adequately, and accurately presented to the jury. *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592, 604 (2000) (citing *Commonwealth v. Smith*, 548 Pa. 65, 694 A.2d 1086, 1092 (1997)). This Court will not review a charge by taking isolated comments out of context. *Id.* The instruction by the trial court, when read in its full context, informed the jury that they could not find Appellant guilty of any charge of murder or manslaughter unless they first found that the Commonwealth had proven beyond a reasonable doubt that Appellant's conduct "was the direct cause" of the deaths of the victims. *See* N.T. 10/31/90 p. 899. There is, therefore, no merit to this claim, and appellate counsel was not ineffective for failing to raise it.

### 2. Failure to Contact Character Witnesses and Witnesses on Defendant's Behalf

As his next assertion of ineffective assistance of appellate counsel, Appellant contends that trial counsel was ineffective for failing to call certain character witnesses and other witnesses purportedly favorable to his defense and that appellate counsel was ineffective for failing to raise this in postverdict motions or on appeal.

In order to prevail on a claim of ineffective assistance of counsel for failing to call a witness, the appellant must show: (1) the existence and availability of the witness; (2) counsel's awareness of, or duty to know of, the witness; (3) the willingness and ability of the witness to cooperate and appear on behalf of the defendant; and (4) the necessity of the proposed testimony in order to avoid prejudice. *Commonwealth v. Priovolos*, 552 Pa. 364, 715 A.2d 420, 422 (1998). None of the individuals identified by Appellant as favorable witnesses satisfies this standard. First, Appellant identifies three inmates and two guards from Holmesburg prison who allegedly observed him shortly following his arrest and who

would have testified regarding the condition of Appellant's foot when arrested. However, Appellant fails to offer affidavits [7] from these individuals or to supply proof that they were available and would have testified on his behalf at trial. Next, Appellant names two neighbors, Carl Tegeder and Jan Shafransky, who Appellant avers would have testified, respectively, that: (1) Appellant left his family's home voluntarily instead of having been told to leave, as the Commonwealth argued; and (2) Tim O'Reilly started a false rumor that Appellant had threatened his family. Again, Appellant fails to offer any proof that these witnesses were available and would have testified favorably for him at trial.[8] Finally, Appellant relies on a letter from Maryanne Bonzcyk to demonstrate Ms. Bonzcyk's willingness to testify on his behalf as a character witness whom trial counsel should have called. This assertion is wholly without merit, as Ms. Bonzcyk admits in the letter that she was "not sure how much my testimony would help [Appellant]" because she would have to tell the truth about "the bad times in [Appellant's] life," including his drug use. Appellate counsel was not ineffective for failing to pursue these matters.[9]

**7.** Appellant includes in his *pro se* brief a statement signed by one Pedro Cruz and dated October of 1990, in which Mr. Cruz asserts that he was held in the Detention Center when Appellant was arrested in July of 1989 and that he observed that Appellant's left foot was swollen. There is no indication in this statement that Mr. Cruz would have been willing to testify on Appellant's behalf at his trial. Further, even if Mr. Cruz would have been willing to testify on Appellant's behalf, there is nothing in Mr. Cruz's statement that exonerates Appellant because it is undisputed that Appellant's foot was injured by the time he had been placed in custody subsequent to the commission of the crimes. *See Pierce*, 645 A.2d at 193.

**8.** Appellant relies on an incomplete copy of a written investigation report by Detective Dembeck describing an interview with Mr. Tegeder, in which the detective asked him, "Did George [Pierce] ever mention any problems?" to which Mr. Tegeder responded, "On Saturday, 7–2–89, George told me that [illegible] his son was moving out." The remainder of this investigation report is omitted. Appellant offers nothing with respect to Jan Shafransky.

**9.** Appellant includes a list of individuals whom he claims should have been called as witnesses. *See* Brief of Appellant, Exhibit "D". This list does not satisfy the above-mentioned standards for showing counsel's ineffectiveness for not calling these alleged witnesses.

### 3. *Failure to Raise Issue of Prosecutorial Misconduct*

In his third claim of ineffective assistance of appellate counsel, Appellant complains that counsel should have raised an issue of prosecutorial misconduct based on the prosecutor's statement during closing argument that the fire was started by the use of gasoline contained in an antifreeze jug.

It is well established that a prosecutor must have reasonable latitude in presenting a case to the jury and must be free to present his or her arguments with logical force and vigor. *Commonwealth v. D'Amato*, 514 Pa. 471, 526 A.2d 300, 309 (1987). Counsel's remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony. *Id., citing Commonwealth v. Fairbanks*, 453 Pa. 90, 306 A.2d 866 (1973). Thus, the prosecutor is entitled to refer to the evidence and argue that it establishes the guilt of the accused. *Commonwealth v. Cox*, 556 Pa. 368, 728 A.2d 923, 931 (1999). Moreover, reversible error exists only if the unavoidable effect of the supposedly offending language would prejudice the jurors and form in their minds a fixed bias and hostility towards the defendant such that they could not weigh the evidence and render a true verdict. *Id., citing Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531 (1986).

Contrary to Appellant's assertions, the evidence supported the prosecutor's references to the fire having been started by gasoline contained in an antifreeze jug. A neighbor, Sharon DeFazio, testified that the victims kept gasoline for their lawnmower in an antifreeze jug in the garage. An assistant fire marshal who investigated the scene testified that the fire was incendiary in origin and that the antifreeze jug found in the basement of the victims' home where the fire damage was heaviest had a "heavy odor of gasoline." N.T. 10/26/90 pp. 447–48. This testimony was sufficient to support the prosecutor's arguments that Appellant had used gasoline contained in an antifreeze jug to set the fire in the basement.[10] Therefore,

10. The sole basis for Appellant's claim that the prosecutor committed misconduct in arguing to the jury that the fire had been deliberately set

appellate counsel was not ineffective for failing to raise this issue on direct appeal.[11]

■ Appellant also claims ineffective assistance of counsel for failing to raise issues of prosecutorial misconduct for comments made by the prosecutor during closing argument concerning statements made by Appellant demonstrating his intent to burn down his family's house, and regarding the relationship of Appellant to the Commonwealth's witness, Tim O'Reilly.[12] The first objection made by Appellant is to the following statement from the prosecutor during closing: "Remember, he said I'm gonna roast them, I'm gonna burn the house down. I'm gonna take them to hell with me if I decide

by using gasoline contained in an antifreeze jug is the testimony from Joseph McBride, a civilian chemist for the Philadelphia Police Department, who stated that a five milliliter sample of liquid obtained from the victims' home tested negatively for the presence of gasoline. Appellant ignores other testimony from Mr. McBride that carpet debris from the victims' home tested positively for gasoline. N.T. 10/29/90 p. 643. Although this testimony upon which Appellant relies may weigh against the Commonwealth's proof before the jury, we have already noted that other evidence that the fire was started by gasoline contained in an antifreeze jug supported the prosecutor's closing argument, which did not, therefore, constitute prosecutorial misconduct. Appellant repeats this meritless assertion in his ninth appellate issue, arguing that the prosecutor committed misconduct by making any references during the trial to the fire having been started by means of gasoline from an antifreeze jug. Brief of Appellant, pp. 48–50. We similarly reject this claim.

11. In a related issue, Appellant claims prosecutorial misconduct and alleges that the Commonwealth knowingly used perjured testimony at trial. Brief of Appellant, pp. 37–40. PCRA counsel declined to raise this issue as being without merit, and Appellant presently challenges PCRA counsel's ineffectiveness for failing to raise it. No relief is due. Again based on Mr. McBride's testimony that a liquid sample taken from the scene tested negatively for the presence of gasoline, Appellant contends that all trial testimony concerning the presence of gasoline odors was necessarily perjured. Appellant offers nothing to support this claim other than his own wild conjecture, and we will not find counsel ineffective for refusing to advance this claim.

12. Appellant also claims that the prosecutor improperly vouched for the credibility of a witness by purportedly contending during closing argument that Appellant's sister, Joan Pierce, was Appellant's "closest associate" while he stayed with her in California. Brief of Appellant, p. 42. We have reviewed the prosecutor's closing argument and can find no such statement.

to kill myself, too . . . ." N.T. 10/31/90 p. 889. The next objection Appellant makes is to the prosecutor's characterization of Tim O'Reilly as Appellant's "best friend."

The essence of finding prosecutorial misconduct is that the prosecutor, a person who holds a unique position of trust in our society, has abused that trust in order to prejudice and deliberately mislead the jury. *Commonwealth v. Pierce*, 537 Pa. 514, 645 A.2d 189, 197 (1994). A prosecutor must argue only those inferences that reasonably derive from the evidence at trial. *Commonwealth v. Miles*, 545 Pa. 500, 681 A.2d 1295, 1301 (1996), *cert. denied*, 520 U.S. 1187, 117 S.Ct. 1472, 137 L.Ed.2d 684 (1997). Moreover, this Court has held that as long as there is a reasonable basis in the record for the comments, we will permit vigorous prosecutorial advocacy. *Id.* at 1302. Finally, we will not reverse based on a prosecutor's comments unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 639 (1995), *cert. denied*, 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996).

Here, the comments by the prosecutor do not entitle Appellant to relief. In stating to the jury that Appellant had stated "I'm gonna roast them," the prosecutor was attempting to paraphrase the testimony of Tim O'Reilly, who testified that Appellant told him "[Appellant] had nothing to live for, and he was either gonna kill himself or he said he was gonna kill himself and take his parents with him. I think the exact words were to hell with them." N.T. 10/29/90 p. 500. O'Reilly had also testified that Appellant had told him "three or four times . . . at length and seriously" that he intended to burn his parents' house down. N.T. 10/29/90 p. 535. Although the record does not support the prosecutor's specific attribution of the term "roast" to Appellant, we conclude that this comment, when viewed in the entire context of the incriminating statements regarding Appellant's intention to burn down his par-

ents' house, did not prejudice Appellant nor form in the minds of the jury a fixed hostility and bias against him. Finally, the prosecutor's reference to Tim O'Reilly as Appellant's "best friend" was a fair inference from O'Reilly's testimony that he and Appellant had been friends for twenty-two years and that Appellant stayed with O'Reilly after he left his parents' residence. Accordingly, here also Appellant's claims of ineffective assistance of counsel fail.

### 4. *Failure to Challenge Witnesses' Identifications*

Appellant claims that appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness for not raising a due process claim regarding the identification testimony of three witnesses. First, Appellant contends that the trial court should have suppressed the identification testimony of Harry Espenshade (Espenshade) and Randy Zehnder (Zehnder) as the product of an unnecessarily suggestive description of the suspect that these witnesses heard on the police radio. Second, Appellant contends that Police Sergeant Richard Shanfield's (Shanfield) encounter with Appellant at the police station on the night of the incident tainted his subsequent identification testimony.

Whether a pretrial identification is to be suppressed as unreliable and, hence, violative of due process, is determined from the totality of the circumstances. *Commonwealth v. Sutton,* 496 Pa. 91, 436 A.2d 167, 169 (1981). A pretrial identification will not be suppressed as violative of due process rights unless the facts demonstrate that the identification procedure was so infected by suggestiveness "as to give rise to a substantial likelihood of irreparable misidentification." *Commonwealth v. Sample,* 321 Pa.Super. 457, 468 A.2d 799, 801 (1983) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). Even where a pretrial identification is tainted by impermissibly suggestive pretrial procedures, the subsequent in-court identification will be admissible if there exists an independent basis for the identification. *Commonwealth v. Abdul Salaam,* 544 Pa. 514, 678 A.2d 342, 349 (1996), *cert. denied,* 520 U.S. 1157, 117 S.Ct.

1337, 137 L.Ed.2d 496 (1997). The factors to consider when determining whether an independent basis exists for the identification are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id., citing Commonwealth v. Carter,* 537 Pa. 233, 643 A.2d 61, 71 (1994).

■ Appellant's objection to the admission of testimony from Espenshade and Zehnder is without merit. Espenshade testified that he and Zehnder were walking towards the fire location when he saw a man with dark hair, wearing a flannel shirt, who was running near the scene. He stated that the man had a moustache and was approximately 5'10″ tall and weighed 170 pounds. Espenshade testified that he witnessed the man for about ten to fifteen seconds. He and Zehnder told a nearby police officer that the house was on fire. The police detained Espenshade and Zehnder in a police car for over an hour. While in the police vehicle, Espenshade testified that he heard a description of the suspect the police were looking for in connection with the fire as a "white male wearing dark clothes." After his release from the police vehicle, Espenshade saw the same individual he had previously witnessed running near the fire location walking near the scene. At the preliminary hearing and at trial, he identified Appellant as the man he had seen fleeing from the fire scene. Under these circumstances, we see nothing in this identification of Appellant or in the report that Espenshade heard over the police radio as unduly suggestive such that Espenshade's identification of Appellant was unreliable. Accordingly, counsel was not ineffective for not pursuing this claim.

■ Similarly, Zehnder testified that he witnessed the same individual fleeing the scene whom Espenshade saw, and also admitted to hearing a police radio description of a suspect, but he could not recall the particulars of that description. Zehnder testified that he knew Appellant from the neighbor-

hood and was able to identify him at the pretrial suppression hearing and at trial as the man he witnessed running from the scene. We find nothing in Zehnder's hearing of a police radio report as involving a suggestive identification and do not find Zehnder's pretrial identification of Appellant to be violative of Appellant's due process rights. Counsel will not be deemed ineffective for not raising this issue.

Finally, Appellant contends that Police Sergeant Shanfield's encounter with Appellant at the police station's homicide unit was unduly suggestive and tainted Shanfield's subsequent identification testimony. Shanfield testified that he was driving very slowly near the fire scene when an individual ran in front of his car. Shanfield testified that the individual was a white male with shaggy hair, some facial hair, and was wearing dark clothing. That individual, whom Shanfield identified at the preliminary hearing, pretrial suppression hearing and at trial as Appellant, ran approximately fifteen feet in front of Shanfield's vehicle. Shanfield was able to view Appellant for about five to ten seconds before Appellant ran away. Two and a half-hours after this incident, Shanfield reported to the homicide unit at the Philadelphia Police Administration Building to give a statement. While passing by one of the interview rooms, Shanfield saw Appellant sitting alone and recognized Appellant as the individual who had run past his car.

We do not believe that this encounter with Appellant at the police station tainted the reliability of Shanfield's testimony. The encounter between Shanfield and Appellant was inadvertent and not an attempt to conduct a one-on-one identification lineup. Where a spontaneous identification of a suspect by a witness is not the product of police contrivance, the identification does not violate due process. *See Commonwealth v. Wilcox*, 481 Pa. 284, 392 A.2d 1294, 1297 (1978); *Commonwealth v. White*, 447 Pa. 331, 290 A.2d 246, 252 (1972). Further, Shanfield had sufficient opportunity to view Appellant at the scene such that his subsequent identification

of Appellant was not unreliable. Counsel was not ineffective for refusing to pursue this issue.

### 5. *Failure to Request Mercy Dispensing Instruction*

Next, Appellant claims appellate counsel was ineffective for not challenging trial counsel's ineffectiveness for failing to request a mercy-dispensing jury instruction during the guilt phase of Appellant's trial. In essence, Appellant claims that he was entitled to an instruction that the jury could acquit him of any degree of murder or manslaughter regardless of the facts proven and the elements of the crimes as instructed by the trial court. This claim is completely without merit. Appellant cannot claim entitlement to a jury instruction that has no basis in the evidence presented at trial. *See Commonwealth v. Carter,* 502 Pa. 433, 466 A.2d 1328 (1983) (defendant not entitled to unreasonable belief voluntary manslaughter instruction where no evidence supported such charge). Appellate counsel was not ineffective for refusing to pursue this issue.

### 6. *Failure to Object to Conclusions of Medical Examiner as to Cause of Death*

In another layered claim of ineffective assistance of counsel, Appellant argues that trial counsel was ineffective for not objecting to the testimony of Dr. Bennett Preston, the Assistant Medical Examiner, that the victims' deaths were homicides. On direct examination, Dr. Preston, a forensic pathologist, testified that the cause of the deaths of Anna Hayes and Mary Pierce was smoke and soot inhalation, and that George Pierce died from "smoke and soot inhalation and thermal body burns complicated by bronchopneumonia." N.T. 10/26/90 p. 384. When questioned by the prosecutor concerning the manner of death, Dr. Preston testified that the victims had died in a homicide from an arson fire. Dr. Preston explained that the basis for his opinion as to the manner of death was information he obtained from the fire marshal regarding the cause of the fire and that forensic pathologists routinely rely on this type of information when investigating

deaths caused by fires to distinguish accidents from homicides. Trial counsel did not object to this testimony, and Appellant presently claims that prior counsel were ineffective for not arguing that Dr. Preston's testimony as to the manner of death was inadmissible and prejudicial.

We disagree. A medical expert is permitted to express opinion testimony on medical matters based, in part, on reports of others which are not in evidence, but which the medical expert customarily relies upon in the practice of his or her profession. *Commonwealth v. Elliott*, 549 Pa. 132, 700 A.2d 1243, 1252 (1997), *cert. denied*, 524 U.S. 955, 118 S.Ct. 2375, 141 L.Ed.2d 742 (1998); *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630, 639 (1991). Here, Dr. Preston testified that a conclusion regarding the manner of death is a routine part of his investigations and that forensic pathologists, when investigating deaths caused by fires, rely on the reports of the fire marshal as to whether the fire was deliberately or accidentally set. N.T. 10/26/90 pp. 375–76. Additionally, the trial court avoided any potential prejudice from Dr. Preston's testimony by immediately giving a clear instruction that reminded the jury that it was their function to determine whether the deaths were homicides:

> THE COURT: Members of the jury, the testimony as to the manner of death whether it is a homicide or not is for you and you alone, and although the doctor is permitted to testify to that, that it is in conjunction with his report, it is not a determination that it was, indeed, homicide. That's for you to decide and you alone.

N.T. 10/26/90 p. 376. Consequently, no relief is due on this claim.

### 7. *Selection of Juror Number Two*

Appellant next contends that appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness for not using a peremptory strike to remove a prospective juror from the venire. Appellant objects to the selection of Howard Peltzman as a juror and argues that Mr. Peltzman indicated during voir dire that he had formed an opinion of

Appellant's guilt. Although he admittedly acquiesced in trial counsel's decision not to strike Mr. Peltzman from the venire, Appellant now maintains that he was "overborne" by trial counsel.

No relief is due on this claim, as Appellant cannot demonstrate how he was prejudiced by the selection of Mr. Peltzman as a juror. Although Mr. Peltzman admitted that he had read about the incident in newspaper articles at about the time that it occurred and that he believed these articles suggested Appellant's guilt,[13] he later testified that he had no fixed opinion regarding the guilt or innocence of the accused and would be able to follow the instructions of the court. N.T. 10/17/90 pp. 50–51. Absent evidence that Mr. Peltzman was incapable of setting aside preconceived impressions or opinions about the case, Appellant cannot show how the selection of Mr. Peltzman deprived him of a fair trial. *See Commonwealth v. Tressler*, 526 Pa. 139, 584 A.2d 930 (1990). Therefore, Appellant cannot show that prior counsel were ineffective for failing to raise this issue.

### 8. *Failure to Object to Prosecutor's Examination of Witnesses*

In this issue, Appellant claims that prior counsel were ineffective for failing to object to the alleged leading of witnesses by the prosecutor. Specifically, Appellant contends that the prosecutor nodded her head to indicate "yes" and "no" answers to witnesses whom she was questioning and that the prosecutor improperly communicated with witnesses Espenshade and Zehnder during a break in the trial. With regard to the leading of witnesses, the record does not support Appellant's claim. When Appellant complained during the trial that the prosecutor was leading witnesses' testimony by her head movements, the trial court rejected that assertion and stated:

13. Appellant relies on the following exchange during voir dire: "THE COURT: You mean these papers indicated to you, from reading it, that the person who was arrested was the person who committed the crime. Is that what you are saying? [Mr. Peltzman]: That's correct or at least that's the way I interpreted it." N.T. 10/17/90 pp. 44–45.

THE COURT: With respect to [the prosecutor's] conduct in questioning the witnesses, that's up to the Court to determine when and if there's an appropriate objection, and I have seen nothing to indicate that [the prosecutor] has acted other than in an appropriate way and when she has led the witness, there's been an objection, and I have ruled on it.

N.T. 10/26/90 pp. 364–65. Furthermore, Appellant fails to identify those witnesses whose testimony the prosecutor supposedly led by her head nodding. This is insufficient to support a claim of ineffective assistance of counsel for failing to raise this issue. Regarding the prosecutor's communication with Espenshade and Zehnder during a break in the trial, the prosecutor explained when Appellant made this complaint at the hearing on his post-verdict motions that she was handing them their witness fee slips. N.T. 10/22/91 p. 9. Appellant engages in nothing more than speculation that the prosecutor's conduct was improper and offers nothing to contradict the prosecutor's assertion that her limited communication was entirely proper. Such speculation cannot support a claim for ineffective assistance of counsel for not pursuing this matter. *See Commonwealth v. Pursell,* 555 Pa. 233, 724 A.2d 293, 314 (1999); *Commonwealth v. Morris,* 546 Pa. 296, 684 A.2d 1037, 1045 (1996), *cert. denied,* 521 U.S. 1106, 117 S.Ct. 2484, 138 L.Ed.2d 992 (1997).

### 9. *Failure to Object to Use of Diagram by Witness*

The next layered ineffective assistance of counsel claim raised by Appellant concerns prior counsel's failure to allege prosecutorial misconduct for violation of a sequestration order by the use of a diagram of the crime scene by witnesses Espenshade and Zehnder during their testimony. Appellant contends that Zehnder was able to see Espenshade's testimony because Espenshade, who testified first, had marked his initials on the diagram indicating where he was located and marked the letter "X" to show where Appellant was located when he saw Appellant on the night of the fire. Zehnder used the same diagram containing Espenshade's initials and markings to illustrate where he had seen Appellant on the night of

the fire. The use of the diagram by the prosecutor in this fashion, according to Appellant, amounted to a deliberate violation of the sequestration order by permitting Zehnder's testimony to be influenced by Espenshade's initials and markings, and prior counsel were ineffective for not raising this issue.

We must reject this claim because the record establishes that Appellant suffered no prejudice from the witness' use of this diagram. Zehnder was not told what the markings on the exhibit meant prior to his testimony. Further, Appellant cannot show that Zehnder altered his testimony as a result of viewing the marked-up diagram; indeed, his testimony at trial appears to be consistent with his testimony at the suppression hearings. *See* N.T. 10/16/90 pp. 77–93. Because Appellant cannot demonstrate prejudice from counsels' failure to pursue this issue, we will not grant him relief on this claim.

### B. *Claims of Ineffective Assistance of PCRA Counsel*

Appellant raises various claims of ineffective assistance of PCRA counsel for failing to include certain issues in the PCRA proceedings or to address them in a *Finley* letter.[14] The first complaint Appellant makes of PCRA counsel's performance concerns the failure to include numerous claims that Appellant requested that PCRA counsel raise that were not raised. These issues are contained in a handwritten document entitled "Post Verdict Motion Supplement" attached as Exhibit "A" to Appellant's brief. This document consists of a list of 45 main issues with 99 sub-issues. Other than listing these issues and broadly asserting that PCRA counsel was ineffective for not raising them, Appellant does not develop these claims with any analysis of the record or specific allegations of how the failure to present these claims prejudiced him. Absent a demonstration of prejudice, Appellant cannot prevail on a claim for ineffective assistance of counsel and no further inquiry into the claim is warranted. *See Commonwealth v. Fletcher,* 561 Pa. 266, 750 A.2d 261(Pa.), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000).

**14.** *Commonwealth v. Finley,* 379 Pa.Super. 390, 550 A.2d 213 (1988).

 Similarly, Appellant claims PCRA counsel was ineffective for failing to raise issues that Appellant purportedly requested be included in the PCRA proceedings.[15] In none of these issues does Appellant demonstrate how the alleged errors deprived him of a fair trial, i.e., one whose result was not reliable. *See Commonwealth v. Wallace*, 555 Pa. 397, 724 A.2d 916, 921 (1999) (in order to meet prejudice prong of the ineffectiveness standard, a defendant must show that there is a reasonable probability that, but for the act or omission, the outcome of proceeding would have been different). Consequently, there can be no finding of ineffective assistance of PCRA counsel for failing to raise issues where Appellant cannot show that he was prejudiced.

 Additionally, Appellant argues that PCRA counsel violated the procedures for withdrawal from representation in collateral proceedings described in *Commonwealth v. Turner*, 518 Pa. 491, 544 A.2d 927 (1988) and *Commonwealth v. Finley*, 379 Pa.Super. 390, 550 A.2d 213 (1988) by not addressing the numerous issues that Appellant claims he asked PCRA counsel to raise in the petition.[16] *Turner* and *Finley* govern the withdrawal by counsel from representation in collateral proceedings where counsel determines that no meritorious issues exist. In this case, however, none of Appellant's three appointed PCRA counsel—Mr. Siegel, Mr. Gelman, or Mr. Epstein—sought to withdraw from representation on the grounds that there were no meritorious issues. Instead, counsel were permitted to withdraw when it became apparent

15. These claims appear in Exhibit "C" to Appellant's brief. Most of these "claims": (1) relate to matters that have been previously addressed; (2) contain unfounded accusations of prosecutorial misconduct; (3) incorrectly contend that this Court misstated facts in our opinion on direct appeal; or (4) allege various unfounded due process violations. Attached to this Exhibit "C" to Appellant's brief is a handwritten document entitled "Additional Motions and Amendments to Foregoing Attached Motions for Removal of Counsel Due to Ineffectiveness on Appeal". This document lists 83 main issues and numerous sub-issues that Appellant presently asserts PCRA counsel was ineffective for failing to raise.

16. Appellant raises this objection with respect to Mr. Siegel's representation of him prior to the dismissal of his petition and Mr. Gelman's representation of him subsequent to the filing of this appeal.

that Appellant refused the further assistance of counsel and decided to proceed *pro se.* The trial court found, and we agree, that Appellant knowingly, voluntarily, and intelligently waived his right to counsel on appeal from the denial of his PCRA petition. Indeed, Appellant has obtained review by this Court of the numerous claims of ineffective assistance of PCRA counsel for failing to raise the issues Appellant sought to have included below, which is the proper avenue when counsel has not withdrawn on the grounds that the petition lacks merit, but has chosen to limit the issues presented in the PCRA proceedings. *See Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 701 (1998) (relief available to an appellant for a claim that PCRA counsel's judgment was exercised in a legally ineffective manner is an evaluation of the claims prior counsel has forgone for a determination of ineffectiveness). Consequently, no relief is due on this claim.

Next, Appellant contends that PCRA counsel was ineffective for failing to request that Judge Savitt, who presided over Appellant's trial, recuse himself from hearing Appellant's PCRA petition on specific grounds alleged by Appellant.[17] Appellant raises three reasons for Judge Savitt's recusal: (1) the judge gave three allegedly erroneous jury instructions; (2) the judge could not impartially decide Appellant's ineffectiveness of counsel and prosecutorial misconduct claims because he had congratulated counsel on their performance at the close of trial; and (3) the judge could not rule fairly on claims related to trial court errors because they involved challenges to his decisions from Appellant's trial.

Recusal is required only where the party requesting recusal establishes that there is a substantial doubt as to the jurist's ability to preside impartially. *Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310, 1320 (1995), *cert. denied,* 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996) (citing *Commonwealth v. Boyle,* 498 Pa. 486, 447 A.2d 250, 252 (1982)). In this case, none of the grounds that Appellant

17. The PCRA court denied Appellant's Motion for Recusal on October 19, 1995.

argues PCRA counsel should have raised required Judge Savitt to recuse himself. Contrary to Appellant's assertions, the jury instructions were not improper, as we have previously noted. Further, the comments by the judge on the performance of counsel at the close of Appellant's trial do not demonstrate an inability to decide Appellant's PCRA petition impartially. Finally, the fact that Judge Savitt presided over Appellant's trial and would be reviewing his previous rulings does not render him incapable of deciding Appellant's PCRA petition. Adverse rulings alone do not establish bias warranting recusal. *Commonwealth v. Abu-Jamal,* 553 Pa. 485, 720 A.2d 79, 90 (1998), *cert. denied,* 528 U.S. 810, 120 S.Ct. 41, 145 L.Ed.2d 38 (1999). Moreover, it is generally preferable for the same judge who presided at trial to preside over the post-conviction proceedings since familiarity with the case will likely assist the proper administration of justice. *Id.* Because the grounds offered by Appellant for Judge Savitt's recusal are devoid of merit, we will not fault counsel for not advancing them.

Finally, Appellant argues that PCRA counsel was ineffective for not asking for reargument or reconsideration of the December 9, 1997 opinion of the trial court on the grounds that the opinion contained factual errors, which PCRA counsel should have sought to correct. Even assuming these allegations were true, Appellant does not explain how he was prejudiced by PCRA counsel's failure to request reconsideration of the opinion of the trial court. Based on our review of the dismissal of Appellant's petition by the PCRA court and of Appellant's allegations of error regarding that dismissal, we cannot see how Appellant suffered any prejudice in this regard and will not find PCRA counsel ineffective on this basis.

## III. *CONCLUSION*

We affirm the denial of Appellant's post-conviction petition. We direct the Prothonotary of the Supreme Court to transmit the record to the Governor pursuant to 42 Pa.C.S. § 9711(h).

220

CASTILLE, Justice, files a Concurring Opinion.

NIGRO, Justice, concurs in the result.

## CONCURRING OPINION

CASTILLE, Justice.

I join the majority opinion. I write separately only to further address appellant's claims that his direct appeal counsel was ineffective.

As the majority notes, appellant's claims of trial court error, as well as his claims alleging that trial counsel was ineffective, are waived under the PCRA since appellant, who was represented by counsel other than trial counsel on post-verdict motions and direct appeal, could have raised these claims on that appeal. Thus, the only claims available to appellant on this *pro se* appeal are his "layered" claims sounding in ineffective assistance of direct appeal counsel, as well as his claims alleging that PCRA counsel was ineffective. In my recent concurring opinion in *Commonwealth v. Williams*, 782 A.2d 517 (Pa.2001), I addressed at some length the "substantive contours of claims of appellate counsel ineffectiveness." *Id.* at 534–37 (Castille, J. concurring). Here, the majority properly concludes that appellant's underlying claims lack substantive merit. Appellate counsel cannot be deemed ineffective for failing to raise these meritless claims in addition to, or instead of, the claims counsel forwarded to this Court. *Commonwealth v. Peterkin*, 538 Pa. 455, 649 A.2d 121, 128 (1994), *cert. denied, Peterkin v. Pennsylvania*, 515 U.S. 1137, 115 S.Ct. 2569, 132 L.Ed.2d 821 (1995); *Commonwealth v. Tarver*, 491 Pa. 253, 420 A.2d 438, 438 (1980). Accordingly, I join fully in the majority's determination that appellant is not entitled to PCRA relief.