J-S23005-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRANDON OLIVIERI | : | |
| | : | |
| Appellant | : | No. 2494 EDA 2023 |

Appeal from the PCRA Order Entered September 13, 2023
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0010998-2017

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRANDON OLIVIERI | : | |
| | : | |
| Appellant | : | No. 2496 EDA 2023 |

Appeal from the PCRA Order Entered September 13, 2023
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0010999-2017

BEFORE: STABILE, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.: **FILED DECEMBER 23, 2024**

Appellant, Brandon Olivieri, is serving a sentence of 37 years to life imprisonment for first-degree murder and a concurrent sentence for third-degree murder arising from the shooting deaths of two victims on October 24, 2017. Appellant appeals from an order dismissing his petition for relief under the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546, without a hearing.

_____

[*] Retired Senior Judge assigned to the Superior Court.

We remand for further proceedings concerning Appellant's claim that trial counsel was ineffective for failing to present expert testimony as to the lack of gunshot residue on a jacket that Appellant allegedly wore on the night of the victims' deaths.

The trial court set forth the factual history of this case as follows:

From the spring to autumn of 2017, ... [Appellant], then aged sixteen years old, was a member of a juvenile friend group that included decedent [C.M.], [N.T.], and [J.H.]. This group, which spent their time near their homes at 12th and Tasker Streets in South Philadelphia, often engaged in acts of rivalry with other similarly aged groups located further south, including a group associated with decedent [S.D.]. [S.D.'s] group spent time in the area of 12th and Ritner Streets, approximately one mile south of 12th and Tasker Streets.

Sometime between December 2016 and April 2017, [Appellant] approached [S.D.] and his friend [E.P.] near the intersection of 12th and Porter Streets in South Philadelphia. During the encounter, [Appellant] challenged [E.P.] to a fight, and [E.P.] punched [Appellant], knocking him to the ground.

Over the course of the subsequent months [Appellant] maintained an Instagram account which he used to participate in a group chat that included the decedent [C.M.], [N.T.], and [J.H.], among others. [Appellant] used the group chat application to post messages and photos, including a photo of a silver .45 caliber pistol. On October 9, 2017, [N.T.] posted a photo to the group chat depicting a piece of feces on the sidewalk stating "Brandon took a shit on opp territory," referring to the area south of Snyder Avenue in South Philadelphia where the decedent [S.D.] was located. Later that day, [Appellant] requested that [N.T.] screenshot and send him an image of the decedent [S.D.] and his associates posted on [S.D.]'s Instagram profile. After [N.T.] did so, [Appellant] responded that he would "pop all of them."

After school on October 24, 2017, [Appellant] and [N.T.] met each other at [Olivieri's] house near the intersection of 12th and Tasker Streets. There, they smoked marijuana and loitered around

before [N.T.] received a phone call from the decedent [C.M.] at approximately 7:00 p.m. During their conversation, [C.M.] indicated that he was looking to fight a group of Hispanic teenagers. [Appellant] armed himself with the silver .45 caliber pistol that appeared in the previous Instagram photo, and travelled with [N.T.] to meet [C.M.] in the area of 9th and Federal Streets. Failing to find the group in question, [Appellant], [C.M.], and [N.T.] encountered [J.H.], and the four travelled to the area of 12th and Ritner Streets.

That evening, the decedent [S.D.] and his friends [A.Z.], [J.J.E.], and ... [N.]D. were spending time together on a corner of the intersection of 12th and Ritner Streets. As [Appellant] and his cohorts approached their location, [S.D.] recognized the group as "12th Street," while [A.Z.] recognized [C.M.] as a classmate in high school and [Appellant] as someone he had met months prior. Upon reaching the intersection, [C.M.] told [A.Z.] that the corner was theirs now, and [S.D.] recognized [Appellant] from the previous fight with [E.P.]. During this encounter, [Appellant] and [S.D.] briefly spoke to each other, before [Appellant] drew the .45 caliber pistol from his waistband. Seeing the pistol, [S.D.] lunged at [Appellant] and attempted to disarm him. During the ensuing struggle, [Appellant] fired three shots, with one round striking his friend [C.M.] and the final shot striking [S.D.].

During the shooting, [A.Z.] dove behind a car to avoid the gunfire. From there, he made eye contact with [Appellant], who put the firearm in his waistband before fleeing the scene of the shooting. Off-duty Philadelphia Police Officer Michael McKowan, who lived on the block where this incident occurred, passed the group while walking his dog ... immediately prior to the shooting. Upon hearing three gunshots, Officer McKowan turned around and saw [S.D.] running towards him, shouting, "you have to help me," before collapsing on the pavement in front of his own home. McKowan quickly returned to his house to bring his dog inside, and on his way to that location, he spotted [C.M.] lying in front of a home at 1202 Ritner Street. Patrol officers began to arrive at the scene, and [Officer] McKowan assisted Officer Scanlon in placing the unresponsive [C.M.] in the back of a squad car for transport to Jefferson Hospital. Officers Lang and Kolenkiewicz attended to [S.D.] and transported him to the same location. After arriving at Jefferson [Hospital], [a doctor] pronounced [C.M.] and [S.D.] dead at 9:04 p.m. and 9:13 p.m., respectively.

... At trial, Deputy Medical Examiner Dr. Albert Chu, an expert in forensic pathology, testified that ... for each decedent, the cause of death was a gunshot wound to the chest and the manner of dea[th] was homicide.

In the immediate chaos after the shooting, each of the teenagers scattered either north on 12th Street or east on Ritner Street. Upon hearing the second shot, [N.D.] ran from the area, and dropped his phone halfway down the block ... before running into a Starbucks and using a phone there to call his stepfather. Both [N.]D. and his stepfather returned to the scene of the shooting, where [N.]D. agreed to speak to the police. [A.Z.] also provided a statement to detectives on October 24, 2017, but failed to identify [Appellant] as the shooter.

... Upon searching the scene, [Philadelphia police detectives] recovered one projectile, three fired cartridge casings ("FCCs"), and identified cameras located at the nearby Star Mini Market. ... [Philadelphia police detectives] examined each bullet specimen and FCC and determined that the projectiles were each fired from the same .45 caliber firearm. [Philadelphia police detectives also] recovered video surveillance footage from multiple sources along 12th Street that depicted a group of teenagers running away from the area of the shooting, with [Appellant] following shortly behind them.

Immediately after the shooting, [N.T.] made more than twenty phone calls in an attempt to contact both [Appellant] and [C.M.]. Later that evening, during a conversation with friend [M.M.], [N.T.] discovered that [C.M.] had been shot.

The next day, [N.T.] visited [Appellant] at [Olivieri's] home, whereupon [Appellant] stated that he did not know how he could keep living with himself and that he had no intention to shoot [C.M.]. [Appellant] later gave the firearm to his friend [R.O.] who, the next day, gave the gun to [M.M.], who hid the gun in a safe under his bed.

On October 26, 2017, [N.T.] accompanied [Appellant] to their friend [L.G.'s] home, and then the three travelled together to [R.O.'s] grandmother's home in Northeast Philadelphia, where [Appellant] hoped to hide out for a time. After [N.T.] and [L.G.] returned to South Philadelphia, [R.O.] met with [M.M.] to dispose of the firearm. They were soon accompanied by [L.G.], who

travelled with them to the Delaware River bank off Columbus Avenue, where they tossed the weapon into the river. As [M.M.], [R.O.], and [L.G.] travelled to the river to dispose of the pistol, [M.M.] engaged in a text message conversation with his paramour [A.H.], and during which he updated her on their progress.

Over the course of the investigation, [N.T.], [A.Z.], and [N].D. each provided statements to the police identifying [Appellant] as a shooter. Though [A.Z.] stated that he did not recognize [Appellant] during his October 24, 2017 interview, he spoke to members of [S.D.'s] family on October 26, 2017, and decided to provide police with an additional statement. That evening, [A.Z.] returned to the interview room, accompanied by an associate of the [S.D.] family identified as "Chris," where [A.Z.] spoke to detectives. [A.Z.] later saw video surveillance footage of the aftermath of the shooting, and was able to identify [Appellant] fleeing the area after the shooting.

In the ensuing weeks and months after the homicide, Philadelphia police detectives recovered cell phones from [Appellant], [N.T.], [L.G.], [M.M.], [A.H.], and each decedent. Detective Lucke, an expert in cell phone data extraction, secured warrants for the devices belonging to [M.M.] and [N.T.], and used data extraction software ... to extract all of the data from each device, including the contents of the deleted Instagram conversations leading up to the shooting and text messages sent by [M.M.] to [L.G.] and [A.H.] on October 26, 2017.

In the aftermath of the shooting, [N.T.] and [Appellant] each deleted their Instagram accounts, causing records of their conversations to display the username "Instagrammer" as opposed to their unique identifiers. At trial, [N.T.] identified himself and [Appellant] as the Instagram users responsible for certain messages in the group chat, and deciphered which message was composed by each individual.

Trial Court Opinion, 9/18/19, at 2-8.

Appellant was charged with C.M.'s and S.D.'s murders and firearms offenses. A jury found Appellant guilty of first-degree murder regarding S.D. (CP-51-CR-0010999-2017), third-degree murder regarding C.M. (CP-51-CR-

0010998-2017), and related firearms offenses. On July 22, 2019, the court imposed sentence. Appellant filed a timely notice of appeal, and this Court affirmed Appellant's judgment of sentence. On November 30, 2021, our Supreme Court denied Appellant's petition for allowance of appeal. Appellant did not appeal to the United States Supreme Court. On August 29, 2022, Appellant filed a timely PCRA petition at CP-51-CR-0010999-2017.[1] On November 29, 2022, he timely filed an amended *pro se* PCRA petition at both CP-51-CR-0010999-2017 and CP-51-CR-0010998-2017. On April 13, 2023, Appellant filed a counseled, amended PCRA petition at both caption numbers through counsel. The PCRA court consolidated both PCRA petitions for purposes of disposition.

Appellant alleged in his amended PCRA petition that even though trial counsel showed that a jacket allegedly worn by Appellant on the night of the shootings did not contain gunshot residue, counsel was ineffective for failing to present expert testimony to "place this fact into context." Amended PCRA Petition, 4/13/23, at 23. On May 12, 2023, Appellant filed of record a letter to the PCRA judge that attached an expert report of Frederick Wentling, a firearm and tool mark examiner. Wentling's report included a one-page description of his professional background as a firearm and tool mark

---

[1] Although Appellant titled the petition as a "post-sentence motion," he clearly intended it to be a PCRA petition since he alleged grounds for relief that are found within the Post Conviction Relief Act at 42 Pa.C.S.A. § 9543. The PCRA court correctly referred to this petition as a PCRA petition in its Pa.R.A.P. 1925 opinion.

examiner. His report asserted that the absence of gunshot residue on the jacket was "inconsistent with [Appellant's] having fired the shots on the night in question." Report of Frederick Wentling, 5/12/23, at 8.

On August 1, 2023, the PCRA court issued a notice of intent to dismiss the amended petition without a hearing pursuant to Pa.R.Crim.P. 907. On September 13, 2023, the court entered an opinion and order dismissing the amended petition. In a single paragraph, the court rejected Appellant's claim that trial counsel was ineffective for failing to present expert testimony concerning the lack of gunshot residue:

> Petitioner fails to support his claim that trial counsel was ineffective for failing to call a gunshot residue expert with a certification or expert report. For that reason alone, Petitioner's claim fails. An assumption that "gunshot residue should have been there," is completely insufficient to establish that Petitioner is entitled to relief.

Opinion, 9/13/23, at 10.

Appellant filed timely notices of appeal at both CP-51-CR-0010998-2017 and CP-51-CR-0010999-2017. The PCRA court did not file a Pa.R.A.P. 1925 opinion.

Appellant raises the following issues in this appeal:

1. Whether the PCRA Court erred in dismissing [Appellant's] claim's of trial counsel's ineffectiveness without a hearing?

2. Whether the PCRA Court erred in dismissing [Appellant's] claims of appellate counsel's ineffectiveness without a hearing?

Appellant's Brief at 9.

The standard of review for an order denying post-conviction relief is limited to whether the record supports the PCRA court's determination, and whether that decision is free of legal error. *Commonwealth v. Beatty*, 207 A.3d 957, 960-61 (Pa. Super. 2019). We give great deference to the PCRA court's findings of fact if they find any support in the certified record, but we do not give the same deference to the court's legal conclusions. *Id*.

Appellant raises multiple claims of ineffective assistance of trial counsel and appellate counsel. "[A]n appellate court reviews the PCRA court's findings of fact to determine whether they are supported by the record, and reviews its conclusions of law to determine whether they are free from legal error." *Commonwealth v. Spotz,* 84 A.3d 294, 311 (Pa. 2014). In addressing ineffective assistance of counsel claims, we are guided by the following authorities:

> [A] PCRA petitioner will be granted relief [for ineffective assistance of counsel] only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.[A.] § 9543(a)(2)(ii). "Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." *Commonwealth v. Colavita*, 993 A.2d 874, 886 (Pa. 2010) (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)). In Pennsylvania, we have refined the *Strickland* performance and prejudice test into a three-part inquiry. *See Commonwealth v. Pierce,* 786 A.2d 203, 213 (Pa. 2001). Thus, to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3)

the petitioner suffered actual prejudice as a result. **Commonwealth v. Ali,** 10 A.3d 282, 291 (Pa. 2010).

**Spotz,** 84 A.3d at 311-12 (citations modified). The PCRA court may deny an ineffectiveness claim if the petitioner fails to meet any one of these prongs. **Commonwealth v. Basemore**, 744 A.2d 717, 738 n.23 (Pa. 2000).

Appellant argues that trial counsel was ineffective for failing to present expert testimony concerning the lack of gunshot residue on a jacket found in his closet two days after the shooting. The PCRA court rejected this argument on the ground that Appellant failed to present an expert report on this issue. The PCRA court is incorrect. The record demonstrates that on May 13, 2023, four months before the court dismissed the amended petition, Appellant submitted an expert report from Frederick Wentling on the gunshot residue issue. Wentling's report opined that the absence of gunshot residue on the jacket was inconsistent with the conclusion that Appellant fired the shots on the night of the homicides.

The proper remedy under these circumstances is to remand this case to the PCRA court for further proceedings concerning Appellant's claim that trial counsel was ineffective for failing to present expert testimony.[2] In particular, the PCRA court should (1) address whether an evidentiary hearing is necessary in view of the opinion expressed in Wentling's expert report, (2)

_____

[2] The PCRA court's September 13, 2023 opinion sufficiently discusses the other issues raised in this appeal, so the PCRA court need not address the other issues on remand.

hold an evidentiary hearing if it determines that one is necessary; and (3) grant or deny relief on the expert testimony issue.

Order vacated. Case remanded for further proceedings in accordance with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/23/2024