# Commonwealth v. Downey

C.P. of Montgomery County, no. 0370-06.

*Jack Larkin,* for Commonwealth.

*David S. Nenner,* for appellant.

HODGSON, *P.J.,* November 22, 2010—Appellant, David Downey, appeals nunc pro tunc to the Superior Court from the order of denial of PCRA relief imposed upon him by this court on April 5, 2010.

## FACTS AND PROCEDURAL HISTORY

The instant case arises out of events that took place between July 30, 2005 and August 1, 2005. On July 30, 2005 between approximately 9:00 p.m. and 10:00 p.m., Kimberly Victorine and her boyfriend, Derrick Schrandt, were driving around Northeast Philadelphia when they received a phone call from the appellant. During the conversation, the appellant indicated that he needed cocaine and an escort.[1] (N.T., Wednesday, June 7, 2006, at p. 232, Thursday, June 8, 2006, at p. 61-64) The cocaine and escort were to be delivered to the appellant's residence in Limerick, Montgomery County, Pennsylvania. In

---

1. The appellant had contacted Victorine for escorts and Schrandt for cocaine on prior occasions.

response to the appellant's phone call, Victorine and Schrandt placed a phone call to David Tanczak in order to obtain Tanczak's sister's phone number so that they could inquire if she was willing to be an escort for the appellant. (N.T., Wednesday, June 7, 2006, at p. 233) She, however, was unavailable. At some point in the evening, Tanczak informed Victorine and Schrandt that Ashley Berg, the victim in the instant action, who was also at Tanczak's residence, would be willing to be an escort for the appellant. (N.T., Wednesday, June 7, 2006, at p. 233, Thursday, June 8, 2006, at p. 68, Friday, June 9, 2006, at p. 92-96) Prior to knowing of Berg's availability, Victorine attempted to contact other girls, including Christine Shute, who had previously served as escorts to inquire into their availability. (N.T., Wednesday, June 7, 2006, at p. 232)[2]

After securing Berg as an escort, Victorine and Schrandt drove to Victorine's residence in Northeast Philadelphia in order to pick up the requested cocaine for the appellant. They then proceeded to Tanczak's residence in the Fishtown section of Philadelphia to pick up Berg. The pair arrived at Tanczak's residence between 11:00 and 11:30 p.m. on July 30, 2005. Once Victorine and Schrandt arrived, Berg entered their vehicle and the three of them proceeded to the appellant's residence. During the drive to the appellant's residence, Victorine did not see Berg use cocaine nor did she give Berg cocaine. (N.T., Thursday, June 8, 2006, at p. 68-69) Further, Tanczak testified that he did not provide Berg with any cocaine prior to her leaving for the appellant's residence. (N.T., Friday, June 9, 2006, at p. 96) Nevertheless, Victorine testified that Berg seemed to be "high." (N.T. Wednesday, June 7, 2006, at p. 237)

2. Despite this testimony, Shute testified that Victorine never called her about being an escort. (N.T., Thursday, June 8, 2006, at p. 286)

While driving to appellant's residence, Berg was asked if "she had ever done anything like that [escorting] before." (N.T., Thursday, June 8, 2006, at p. 70) According to Schrandt, Berg stated that she had. (N.T., Thursday, June 8, 2006, at p. 70) She was informed by Schrandt that appellant may ask her to do cocaine, but she did not have to do the cocaine if she did not want to. (N.T., Thursday, June 8, 2006, at p. 70)

Shortly before arriving at the appellant's residence, Schrandt and Victorine called the appellant to inform him that they were close. (N.T., Thursday, June 8, 2006, at p. 71) In the early morning hours of July 31, 2005, Victorine, Schrandt, and Berg arrived at the appellant's residence. (N.T, Wednesday, June 7, 2006, at p. 239) Upon arriving, Schrandt entered the residence; Victorine and Berg remained in the vehicle. Once inside, Schrandt gave the cocaine that he and Victorine had previously picked up from Victorine's residence to the appellant. (N.T., Wednesday, June 7, 2006, at p. 239) The appellant then gave Schrandt his credit card so that he could withdraw $600. (N.T., Thursday, June 8, 2006, at p. 74) When Schrandt returned to the vehicle, Berg stepped out of the vehicle and entered the appellant's residence. (N.T., Wednesday, June 7, 2006, at p. 240, Thursday, June 8, 2006, at p. 72) Thereafter, Schrandt and Victorine left the appellant's residence.

Prior to driving back to Philadelphia, Victorine and Schrandt stopped at a Wawa located near the appellant's residence in order to use the appellant's credit card to withdraw the designated money. (N.T, Wednesday, June 7, 2006, at p. 241) While en route back to Philadelphia, Victorine received a phone call from the appellant. During the call, the appellant informed her that Berg was acting "weird" and that "she didn't want to party." Later in

the conversation, Victorine spoke with Berg who asked her for Tanczak's phone number. She told Victorine that she needs to speak with Tanczak and that she was "alright." (N.T., Wednesday, June 7, 2006, at p. 242-43) In the early morning hours of July 31, 2005, Tanczak received a call from Berg. (N.T., Friday, June 9, 2006, at p. 98) In that call, Berg informed him that she was not feeling well, that she had the shakes, and that she was tired. (N.T., Friday, June 9, 2006, at p. 100)

The next morning, at approximately 10:30 a.m. on July 31, 2005, Victorine spoke with the appellant by phone. (N.T., Thursday, June 8, 2006, at p. 74) During this conversation, the appellant asked "can you come get this girl out of my house." In addition, the appellant asked her to bring him more cocaine. (N.T., Wednesday, June 7, 2006, at p. 244-45) In response to the call, Schrandt and Victorine proceeded back to the appellant's house with the requested cocaine and arrived at the appellant's residence around 12:00 p.m. (N.T., Wednesday, June 7, 2006, at p. 246) While Victorine remained in the vehicle, Schrandt entered the residence. Once inside, appellant informed Schrandt that Berg was ready to leave. (N.T., Thursday, June 8, 2006, at p. 76) Immediately thereafter, Schrandt noticed Berg, pale with blue lips, lying on the couch covered in a blanket. (N.T., Thursday, June 8, 2006, at p. 77) He tapped her on the foot and asked her if she was ready to leave. However, he received no reply. (N.T., Thursday, June 8, 2006, at p. 77) Upon noticing this, Schrandt told the appellant to get Berg help. (N.T., Thursday, June 8, 2006, at p. 79-80) The appellant replied that Berg was fine, that she was sleeping, and to leave his residence. (N.T., Thursday, June 8, 2006, at p. 79-80)

Thereafter, Schrandt left the appellant's residence,

returned to the vehicle and informed Victorine that Berg did not look well. (N.T, Wednesday, June 7, 2006, at p. 246, Thursday, June 8, 2006, at p. 80) The pair then proceeded to drive back to Philadelphia and to Tanczak's residence. Once at the residence, Victorine and Schrandt informed Tanczak and those present of the events that occurred on their immediate trip to the appellant's residence. (N.T., Wednesday, June 7, 2006, at p. 248, N.T., Thursday, June 8, 2006, at p. 81) In addition to Victorine, Schrandt and Tanczak, Tanczak's sister, DeDe Conn, and Tanczak's girlfriend were present at Tanczak's residence. (N.T., Wednesday, June 7, 2006, at p. 248) While at the residence, Schrandt threatened all present with a gun to not call the police[3]. (N.T., Wednesday, June 8, 2006, at p. 84, Thursday, June 8, 2006, at p. 30) Further, the group was continuously calling the appellant in order to ascertain the well being of Berg. (N.T., Wednesday, June 7, 2006, at p. 251) During one of these calls, the appellant stated that Berg had ingested some lines of cocaine and then went to lie on the couch. The appellant also stated that Berg was "fine." (N.T., Thursday, June 8, 2006, at p. 86)

Later, on July 31, 2005, Shute called Victorine to inquire if Victorine had reached the appellant about money that the appellant owed to Shute. (N.T., Wednesday, June 7, 2006, at p. 253) During the conversation, Victorine asked if Shute would come to her residence as she had something important to discuss with her. Sometime in the afternoon on July 31, 2005, Victorine, Schrandt, Tanczak, Shute, and Michael Tees, Shute's boyfriend, gathered at Victorine's house in order to discuss Berg's situation. (N.T., Wednesday, June 7,

---

3. Schrandt testified, however, that no gun was present. (N.T., Thursday, June 8, 2006, at p. 84)

2006, at p. 253, N.T., Thursday, June 8, 2006, at p. 253, N.T., Friday, June 9, 2006, at p. 6) At some point during the meeting, the group decided to drive to the appellant's residence in three separate cars so that they could take Berg for medical treatment. (N.T., Wednesday, June 7, 2006, at p. 253, Thursday, June 8, 2006, at p. 255) Prior to arriving at the appellant's residence, the group stopped at the Wawa near the appellant's house. (N.T., Wednesday, June 7, 2006, at p. 253) There, it was decided that Shute, Tees, and Schrandt would continue on to the appellant's residence. (N.T., Wednesday, June 7, 2006, at p. 254., Thursday, June 8, 2006, at p. 88)

Upon arriving at the appellant's residence, the three individuals rang the doorbell to which no one responded. (N.T., Thursday, June 8, 2006, at p. 89, 257) They then knocked on the back door, but still no one answered. (N.T., Thursday, June 8, 2006, at p. 89, 257) They then walked around to the back of the house and knocked on the glass door. (N.T., Thursday, June 8, 2006, at p. 89, 257) Through this glass door, Schrandt observed Berg lying on the couch in the same position that she had been earlier. (N.T., Thursday, June 8, 2006, at p. 89) During their testimony, Shute and Tees indicated that they were able to view through the glass door a blond haired person lying on the couch. (N.T., Thursday, June 8, 2006, at p. 250, Friday, June 9, 2006, at p. 10) The three individuals then left the appellant's residence and reconvened with the remainder of the group at Wawa. The group proceeded back to Philadelphia during the evening hours and went their separate ways. (N.T., Wednesday, June 7, 2006, at p. 254, Thursday, June 8, 2006, at p. 91) Later that night, in the early morning hours of August 1, 2005, Victorine and Schrandt went to the bar in which she worked so that she

could talk to her boss, an ex-cop, about Berg's situation. (N.T., Wednesday, June 7, 2006, at p. 258, Thursday, June 8, 2006, at p. 93) Her boss advised her to report the incident to the police. (N.T., Wednesday, June 7, 2006, at p. 258) Shortly thereafter, Victorine made an anonymous tip to the police to report the incident. (N.T., Wednesday, June 7, 2006, at p. 278-79, N.T., Thursday, June 8, 2006, at p. 93)

The next morning, on August 1, 2005, Shute called Victorine for the appellant's phone number so that she could call him about the money that he owed her. (N.T., Thursday, June 8, 2006, at p. 261) After receiving the appellant's number, Shute called the appellant to inquire about her money. (N.T., Thursday, June 8, 2006, at p. 261) Upon speaking with the appellant, Shute and Tees agreed to remove Berg from his residence. Thereafter, Shute and Tees drove to the appellant's residence. (N.T., Friday, June 9, 2006, at p. 15) Upon arriving, the appellant told them that he was a navy seal and CIA agent. He further stated that he had a doctor examine Berg and that she died from an aneurism. (N.T., Thursday, June 8, 2006, at p. 265, Friday, June 9, 2006, at p. 20) While in the residence, Shute and Tees observed Berg, dressed in black panties and socks, lying on the couch and noticed blood coming from her nose. (N.T., Thursday, June 8, 2006, at p. 266, Friday, June 9, 2006, at p. 20) The appellant then covered Berg's face with a towel, gave them a sheet, two pieces of duct tape to cover their license plate, and detailed directions to the nearest hospital. (N.T., Thursday, June 8, 2006, at p. 267-68) In addition, the appellant gave them a bag containing sneakers, a belt, and clothing and a check for $2,000. (N.T., Thursday, June 8, 2006, at p. 267-68) The three individuals then placed Berg in the back of

Shute's and Tees' vehicle, and Shute and Tees left for the hospital.

However, they were unable to find the hospital so they proceeded back to Northeast Philadelphia. (N.T., Thursday, June 8, 2006, at p. 269, Friday, June 9, 2006, at p. 25) There, they drove down a small road and placed Berg's body on the side of the road so that a woman walking her dog nearby would be able to find her quickly. (N.T., Thursday, June 8, 2006, at p. 272, Friday, June 9, 2006, at p. 28) Thereafter, they attempted to cash the check given to them by the appellant but found that Shute had insufficient funds in her account to cash the check against her account. (N.T., Thursday June 8, 2006 at p. 274) They attempted to cash the check at a second bank, but the bank determined the check was illegible. (N.T., Thursday, June 8, 2006, at p. 274) Unable to cash the check, Shute and Tees decided to drive back to the appellant's residence to obtain a new check from the appellant. (N.T., Thursday, June 8, 2006, at p. 275, Friday, June 9, 2006, at p. 30) While at the appellant's residence, Shute and Tees told the appellant where they had taken Berg. The appellant asked them if anyone else knew about the situation to which Shute and Tees replied no. (N.T., Thursday, June 8, 2006, at p. 276, Friday, June 9, 2006, at p. 30) Shortly thereafter, Berg's body was found by the woman walking her dog on the side of the road where Shute and Tees had placed her body. (N.T., Wednesday, June 7, 2006, at p. 50)

As a result of these events, the appellant was subsequently arrested and charged with drug delivery resulting in death in the death of Ashley Berg, among other crimes. The appellant's trial was held between Monday, June 5, 2006 and Wednesday, June 14, 2006. The above facts were testified to in abundance at trial.

In addition to the above-testified facts, several experts testified. One such expert, William Wingert, Chief Toxicologist with the City of Philadelphia Medical Examiner's Office, testified that Berg's blood tested high for a metabolite of cocaine. (N.T., Thursday, June 8, 2006, at p. 191) In addition, Berg's blood tested at 1.7 milligrams per deciliter of cocaine. (N.T., Thursday, June 8, 2006, at p. 192-93) Further, Katherine Cross, Forensic Biologist for the National Medical Service, testified that blood found on the cushions of the appellant's couch belonged to Berg. (N.T., Friday, June 9, 2006, at p. 150) Additionally, Gregory McDonald, Medical Examiner for the City of Philadelphia, testified that cocaine poisoning was the cause of Berg's death and based on rigor and fixed lividity, Berg's death would have occurred prior to 3:47 a.m. on August 1, 2005. (N.T., Monday, June 12, 2006, at p. 69, 75)

In addition to the above evidence, the Commonwealth introduced testimony of five escorts previously employed by the appellant in order to establish a common plan scheme or design on the part of the appellant. Such evidence was presented to show that the appellant regularly provided the escorts that he employed with cocaine.

The appellant presented a few witnesses on his behalf. Among those witnesses was Dr. Michael Greenberg, a board certified physician in emergency medicine. This witness was used by the appellant in order to call into question expert testimony regarding the amount of cocaine found in Berg's blood. (N.T., Monday, June 12, 2006, at p. 156) Further, counsel was able to elicit on cross-examination from DeDe Conn that Berg had previously used cocaine and from Gregory McDonald that Berg was a drug user

of at least two different types of drugs, PCP and cocaine. (N.T., Thursday, June 8, 2006, at p. 237-40, Monday, June 12, 2006, at p. 81-82)

On June 14, 2006, a jury found the appellant guilty of drug delivery resulting in death and other crimes. On September 27, 2006, we sentenced the appellant to 7 1/2 years to 15 years for his conviction of drug delivery resulting in death.[4] Thereafter, on October 4, 2006, the appellant appealed his judgment of sentence. On August 31, 2007, the Superior Court affirmed this court's judgment of sentence.

Subsequently, appellant filed his first amended petition for post-conviction relief in which he raised the claim of ineffectiveness of counsel, Thomas Egan, III, Esquire. On March 30, 2010, an evidentiary hearing was held to assess the merit of appellant's claim. Upon concluding that appellant failed to prove ineffectiveness pursuant to *Commonwealth v. Pierce*, 786 A.2d 203 (Pa. 2001) and *Commonwealth v. Ligons*, 971 A.2d 1125 (Pa. 2009), this court dismissed appellant's petition on April 5, 2010. On April 13, 2010, appellant filed a motion for reconsideration which was subsequently denied by this court on April 20, 2010. On May 14, 2010, appellant filed a notice of appeal from "the order of denial of request for reconsideration of order denying PCRA." The Superior Court quashed this appeal as untimely on September 9, 2010.

On October 1, 2010, appellant filed a PCRA petition to reinstate appellate rights nunc pro tunc. Pursuant to

---

4. In addition, the court also sentenced the appellant to a consecutive one to two year sentence for possession with intent to deliver and various other concurrent sentences for other convictions.

an October 13, 2010 order, this court granted appellant's petition to reinstate appellate rights. On October 19, 2010, appellant filed notice of appeal of the court's April 5, 2010 dismissal of appellant's PCRA. In accordance with Section 1925(b) of the Pennsylvania Rules of Appellate Procedure, we directed the appellant to file a concise statement of matters complained of on appeal no later than November 11, 2010. The appellant filed such statement on November 9, 2010.

## LEGAL DISCUSSION

The appellant raises the following issues on appeal:

1. Whether there was ineffective assistance of both trial counsel and appellate counsel by:

A. failing to request that the trial court instruct the jury on the charge of involuntary manslaughter;

B. failing to consult with appellant prior to trial to prepare his defense to the criminal charges including, but not limited to, presenting evidence to negate the malice requirement to substantiate third degree murder;

C. failing to consult with appellant to discuss the viability of requesting the trial court to instruct the jury on the lesser included offense of involuntary manslaughter; and

D. failing to present evidence and/or arguments during trial to negate the element of malice, the required mens rea for the criminal offense of involuntary manslaughter.

It is well-established that counsel is presumed

effective and that the appellant bears the burden of establishing ineffectiveness. *Commonwealth v. Cooper*, 596 Pa. 119, 133, 941 A.2d 655, 664 (Pa. 2007). To overcome this presumption, the appellant must satisfy a three-pronged test and demonstrate that: (1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the appellant suffered prejudice as a result of counsel's deficient performance. *Commonwealth v. Ligons*, 601 Pa. 103, 971 A.2d 1125 (Pa. 2009) citing *Commonwealth v. Pierce*, 567 Pa. 186, 202, 786 A.2d 203, 213 (Pa. 2001). Prejudice in the context of an ineffectiveness claim means demonstrating that there is a reasonable probability that, but for counsel's error, the outcome of the proceedings would have been different. *Commonwealth v. Fletcher*, 604 Pa. 493, 986 A.2d 759 (Pa. 2009). A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any of these prongs. *Pierce*, supra at 221-222. Here, the appellant has failed to satisfy this burden.

First, appellant argues that the counsel was ineffective by failing to request that the trial court instruct the jury on the charge of involuntary manslaughter. Generally, an instruction on involuntary manslaughter is not required unless it has been made an issue in the case and the facts would support such a verdict. *Fletcher*, 986 A.2d at 791, citing *Commonwealth v. White*, 490 Pa. 179, 185, 415 A.2d 399, 402 (Pa. 1980). Here, it is clear from the record that an instruction on involuntary manslaughter was made an issue during the trial. The court, at the close of the Commonwealth's case, suggested to both appellant's counsel and Commonwealth's counsel that the evidence presented

may also fit an involuntary manslaughter charge. (N.T. March 30, 2010 at 157-58) The court asked whether anyone wanted the court to instruct the jury on involuntary manslaughter to give the jury another option in addition to drug delivery by death. (N.T. March 30, 2010 at 158)

Given these facts, appellant's claim is of arguable merit as an instruction on involuntary manslaughter would be appropriate once the charge was made an issue by the court. Although a request for an instruction was warranted, counsel for the appellant testified at the PCRA hearing that he did not request instruction because it was in accordance with the appellant's desires. (N.T. March 30, 2010 at 158) According to appellant's counsel, he discussed the idea of giving the jury the option of involuntary manslaughter; but the appellant dismissed the idea. (N.T. March 30, 2010 at 157) According to appellant's counsel, the appellant did not want to get convicted on any homicide charge and was not willing to offer another option to the jury that could result in jail time. Appellant sought an outright acquittal in the outcome of the jury trial. Counsel's following the directives of his client does not present a claim for ineffectiveness of counsel. See *Commonwealth v. Rios*, 591, Pa. 583, 920 A.2d 790 (Pa. Super. 2007) (holding that client may not allege that counsel was ineffective for following his directives); see also *Commonwealth v. Sam*, 535 Pa. 350, 635 A.2d 603 (Pa. 1993) (held that failure of counsel to present mitigating evidence did not constitute ineffectiveness when the defendant directed counsel not to present such evidence). Thus, counsel had a reasonable basis for failing to request an instruction as he was following the instructions of his client. Accordingly, appellant's claims fails to meet the second prong of the *Pierce* test.

However, even if an abandoned claim is of arguable merit, an appellant is not entitled to automatic relief. Instead, a finding of ineffectiveness can never be made unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the tactics actually utilized. See *Commonwealth v. Brown,* 544 Pa. 406, 676 A.2d 1178, 1186 (Pa. 1996). Such was not the case in this matter. The instruction of involuntary manslaughter would not have resulted in the dismissal of the drug delivery resulting in death charge. Had counsel for the appellant requested a jury instruction on involuntary manslaughter, the potential for success would not have been substantially greater as there was sufficient evidence of guilt for the charge of drug delivery resulting in death.

In order to be convicted of drug delivery resulting in death, the commonwealth must prove beyond a reasonable doubt that (1) a defendant administered, dispensed, delivered, gave, prescribed, sold, or distributed a controlled substance or counterfeit controlled substance to a person; (2) that the administration, dispense, delivery, prescription, sale, or distribution was in violation of the Controlled Substance, Drug, Device, and Cosmetic Act; (3) that the person has died as a result of using the substance; and (4) that a defendant acted with malice. 18 Pa.C.S.A. § 2506.

Addressing each of the elements, the Commonwealth first established beyond a reasonable doubt that the appellant was in possession of cocaine and distributed it to Berg while she was at appellant's residence. This conclusion is supported by the testimony of Schrandt and Victorine. Both Schrandt and Victorine testified to delivering to the appellant cocaine along with Berg on the night of the incident. (N.T. June 7, 2006 at 232; N.T.

June 8, 2006 at 72) Thus, there was cocaine at appellant's residence during Berg's stay there. In addition, the prior bad acts evidence presented at trial established beyond a reasonable doubt that defendant provided cocaine to Berg. During trial, the Commonwealth introduced testimony of five escorts previously employed by the appellant to establish a common plan, scheme or design on the part of the appellant. This testimony demonstrated that the appellant regularly provided cocaine to the escorts while at his residence. Therefore, the Commonwealth satisfied the first two elements of Section 2506. See *Commonwealth v. McCullum*, 529 Pa. 117, 602 A.2d 313, 316 (Pa. 1992) (elements of a crime may be established by circumstantial evidence as long as the combination of evidence links the accused to the crime beyond a reasonable doubt). Turning attention to the third element of Section 2506, the testimony of Commonwealth expert witness Dr. Gregory McDonald of the Philadelphia Medical Examiner's Office satisfied the third element. Dr. McDonald, having conducted the autopsy of Burg, testified that Berg died from cocaine poisoning. (N.T. June 12, 2006 at p. 69)

Finally, the Commonwealth provided sufficient evidence to prove the appellant acted with malice. It is well-settled that malice has been defined as a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Lee*, 626 A.2d 1238 (Pa. Super. 1993). Additionally, malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might result in serious bodily injury. *Lee*, 626 A.2d at 1241 citing *Commonwealth v. Wanamaker*, 444 A.2d 1176 (Pa. Super. 1982). Malice

484

may be inferred from the attending circumstances of the act resulting in death. *Lee*, 626 A.2d at 1241 citing *Commonwealth v. Gardner*, 490 Pa. 421, 424, 416 A.2d 1007, 1008 (Pa. 1980).

The Pennsylvania Superior Court made such an inference of malice and found the defendant guilt of drug delivery resulting in death in the matter of *Commonwealth v. Costa*, 861 A.2d 358 (Pa. Super. 2004). In *Costa*, the defendant engaged in a sex-for-drugs dealt that ultimately resulted in the death of a sixteen-year old girl. 861 A.2d at 360. Shortly after the defendant provided the sixteen-year old victim with ten bags of heroin, the victim became unresponsive. *Id.* After attempts to revive the victim failed, the defendant enlisted the help of a third party to dispose of the victim's body. *Id.* The defendant placed heroin on the nose of the victim, placed the victim in the backseat of a car, and dropped the victim off near her home. *Id.* The defendant abandoned both the vehicle and the victim. *Id.* Based on the facts presented, the court in *Costa* determined that the defendant's actions constituted malice.

Here, the appellant's actions also established malice. Like the defendant's delivery of an illegal substance to an underage victim in *Costa*, the appellant in the instant action distributed cocaine to a seventeen-year old female. Also, similar to the defendant's failure to seek medical assistance for the victim in *Costa*, the appellant here refused to provide medical care for Berg and did nothing to help her. Instead, the appellant allowed the victim to lie in the same position on the same couch for over a twenty-four period. In addition, Shute and Tees testified that they were paid by the appellant to remove Berg from his home. Based on the totality of the circumstances, like

the defendant in *Costa*, the appellant acted with malice. Thus, the Commonwealth proved all three requirements of Section 2506 beyond a reasonable doubt; therefore, there was sufficient evidence of guilt for the drug delivery resulting in death conviction.

Given the sufficient evidence of guilt for the charge of drug delivery resulting in death, it is evident that the outcome of the proceedings would not have been different had a jury instruction for involuntary manslaughter been requested. Thus, the appellant fails to meet the third prong of the *Pierce* test as the appellant has not suffered prejudice as a result of the counsel's performance. See *Commonwealth v. Derk*, 913 A.2d 875, 881 (Pa. Super. 2006) (relief is warranted only where trial counsel's error or omission has so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place). Accordingly, the appellant has failed to meet the last two prongs of the *Pierce* test. Appellant's first claim of ineffectiveness of counsel fails.

Next, the appellant argues that counsel was ineffective by failing to consult with appellant prior to trial to prepare his defense to the criminal charges including, but not limited to, presenting evidence to negate the malice requirement. This claim is completely devoid of any merit. The record from appellant's PCRA hearing provides substantial proof that appellant's counsel repeatedly met with appellant prior to trial. The jury trial in the instant matter commenced June 5, 2006. Both appellant and appellant's counsel testified that counsel met with appellant at appellant's home on August 5, 2005, which occurred just days after the accident and prior to any charges being filed. (N.T. March 30, 2010 at p. 37, 136-37)

In addition, appellant admitted during his testimony that counsel spoke with appellant on various occasions between August 10, 2005 and November of 2005. (N.T. March 30, 2010 at p. 38) Appellant was not indicted on charges until December of 2005. Appellant further confirmed during testimony that counsel met with appellant five times prior to trial while the appellant was confined to the Montgomery County Prison. (N.T. March 30, 2006 at p. 40) Appellant contends that the meetings were very brief and did not afford enough time to go over any information pertaining to trial. However, appellant's five-page letter to counsel on April 2, 2006 belies this assertion. In a letter dated April 2, 2006, appellant stated, "given considerable thought to the discovery we reviewed Friday afternoon. In no particular order..." and proceeded to make a list that spanned five pages. (N.T. March 30, 2010, Commonwealth's Exhibit C-10). Counsel testified that the April 2, 2006 letter addressed in five pages a number of issues in regard to the witness statements that counsel went over with appellant. (N.T. March 30, 2010 at 144) At the end of the letter, appellant wrote, "I value your guidance and friendship." (N.T. March 30, 2010, Commonwealth's Exhibit C-10) Further, in a letter dated March 12, 2006, appellant stated, "Tom, just a short note to thank you for meeting with Mark Quigley and Peter Mooney over dinner. It is good to know that I have three friends, the likes of you fine gentlemen. Warmly, Dave." (N.T. March 30, 2010, Commonwealth's Exhibit C-9)

These handwritten letters provide no indication that appellant was dissatisfied with counsel's representation nor do they indicate counsel failed to consult with appellant prior to trial regarding his defense. Also, appellant's

testimony demonstrates that counsel met with appellant multiple times in the months prior to trial. As such, appellant's second claim of ineffectiveness of counsel fails as it is without merit and fails to meet the first prong of the *Pierce* test.

In appellant's third issue, appellant argues counsel was ineffective by failing to consult with appellant to discuss the viability of requesting the trial court to instruct the jury on the lesser included offense of involuntary manslaughter. We find this claim fails to meet all three prongs of the *Pierce* test. First, counsel's testimony at the PCRA hearing directly contradicts the appellant's assertions. According to counsel, he discussed the issue of the involuntary manslaughter charge; however, appellant dismissed the idea very rapidly. (N.T. March 30, 2010 at p. 157) During the course of trial, the court addressed the viability of an involuntary manslaughter charge. Having discussed the issue with counsel for both sides, the court stated, "It's my understanding that neither the Commonwealth nor the defense is requesting one, is that correct?" (N.T. March 30, 2010 at p. 48) In response, counsel for appellant said, "Yes, Your Honor." (N.T. March 30, 2010 at p. 48) When asked by the court if the decision was made after consulting with counsel's client, counsel responded, "Yes, Your Honor." (N.T. March 30, 2010 at p. 48) The record from trial is devoid of any objection by the appellant to the statements made by appellant's counsel. Thus, both the record and the testimony of counsel demonstrate the claim lacks merit.

Assuming arguendo the claim has merit, appellant's counsel had a reasonable basis not to consult with appellant to discuss the viability of an involuntary manslaughter

charge as the appellant was interested in an outright acquittal. Counsel testified that he was not authorized to offer the jury the option of another charge as the appellant did not want to get convicted of any homicide charge. (N.T. March 30, 2010 at p. 156) Appellant's desire for an outright acquittal is evidenced by appellant's letter to counsel following the conclusion of the jury trial. (N.T. March 30, 2010, Commonwealth Exhibit C-11) In appellant's letter dated August 12, 2006, appellant states, "As I said, I am not guilty and am convinced you share that belief 100 percent." (N.T. March 30, 2010, Commonwealth Exhibit C-11) Given the appellant's position, counsel reasonably chose not to request a jury instruction on involuntary manslaughter and followed the directives of his client.

Furthermore, appellant suffered no prejudice as a result of counsel's actions as the outcome of the proceedings would not have changed regardless of whether counsel consulted with appellant regarding the involuntary manslaughter charge. For the reasons previously mentioned in the court's discussion of the first issue, there was sufficient evidence of guilt for drug delivery resulting in death. Consequently, the appellant does not pass the third prong of the *Pierce* test. Appellant's third claim of ineffectiveness of counsel fails.

Lastly, the appellant argues in his fourth issue that counsel was ineffective by failing to present evidence and/or arguments during trial to negate the element of malice. We find this claim unpersuasive. Appellant directly contradicts this assertion in his testimony during the PCRA hearing. During testimony, appellant admitted that counsel presented the expert testimony of Dr. Greenberg to defeat the malice prong of the drug delivery

resulting in death charge. (N.T. March 30, 2010 at p. 45) Dr. Michael Greenberg of Drexel University College of Medicine testified that Berg died almost instantaneously after she took the drugs. (N.T. March 30, 2010 at p. 45) Appellant's counsel further testified that the appellant's strategy was to establish that Berg came to the residence under the influence of drugs and that appellant did not provide anything to Berg that would have killed her. (N.T. March 30, 2010 at p. 154) Dr. Greenberg's testimony was presented to execute this strategy by testifying that there was nothing that appellant could have done based on the allegations in the record that would have killed Berg given what was found in Berg's system at her time of death. (N.T. March 30, 2010 at 154-55)

Given the admissions made by the appellant as well as the testimony provided by both counsel and Dr. Greenberg, it is clear that appellant's counsel presented both evidence as well as arguments to negate the element of malice, the required mens rea for drug delivery resulting in death. The testimony aimed to establish another potential cause for Berg's death as well as establish that there was nothing the appellant could have done to assist Berg as she died instantly. As such, appellant's fourth claim of ineffectiveness of counsel is without merit and fails to meet the first prong of the *Pierce* test.

## CONCLUSION

Based on the foregoing, the undersigned respectfully requests that the appellant's judgment of sentence be affirmed.