J-S75004-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WENDELL JONES | : | |
| | : | |
| Appellant | : | No. 1781 WDA 2016 |

Appeal from the PCRA Order October 25, 2016
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0008512-2010

BEFORE:  SHOGAN, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY SHOGAN, J.:                    FILED DECEMBER 19, 2017

Appellant, Wendell Jones, appeals from the October 25, 2016 order that denied his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  We affirm.

The PCRA court provided the factual background of this matter as follows:

> The victims in this case were Sonsiarae Watts and Dahl Palm, who were dating each other at the time they were murdered on July 4, 2008. Ms. Watts and Mr. Palm were found dead on the floor of the master bedroom of Ms. Watt[s'] apartment located at 1096 Valley Street. Michael Panella, a forensic pathologist with the Allegheny County Medical Examiner's Office, testified that Ms. Watts suffered two gunshot wounds to her left breast and another gunshot wound to her sternum. The bullet which penetrated her sternum severed her aorta. Mr. Panella testified that this gunshot killed her within minutes. She also suffered two gunshots to her abdomen, one gunshot to her right thigh and one gunshot to her left upper leg. Mr. Panella testified that the cause of Ms. Watts' death was the gunshot wounds and the manner of her death was homicide.

Mr. Panella also testified that Mr. Palm suffered four gunshot wounds to his right lower belly. The wounds struck his heart and aorta and he was dead within minutes. He also suffered two gunshot wounds to his right chest cavity and a gunshot wound to his right forearm. Mr. Panella also noticed a scalp injury resulting from blunt force trauma which he believed was consistent with being pistol whipped. Mr. Panella testified that the cause of death was the gunshot wounds and manner of [Mr. Palm's] death was homicide.

Brandon Palm, the son of victim, Dahl Palm, testified that his father was the president of the West End Chapter of the Brother of the Hammer Motorcy[c]le Club. [Appellant] was the Vice-President of the Chapter. Brandon Palm testified about an encounter between Ms. Watts and [Appellant]. He testified that on May 31, 2008 he was at his father's garage with his father, Ms. Watts and some other people. At one point, [Appellant] showed up at the garage. [Appellant] approached Ms. Watts and she expressed to him that she didn't want to speak to him. She began walking away from him. [Appellant] grabbed the back of her head and began punching her in the face. Mr. Palm intervened and stopped the assault. [Appellant] got on his motorcycle and drove away. Ms. Watts then went to the hospital for treatment.

Marquita Harris testified that she was the sister of Ms. Watts. She testified that Ms. Watts began dating [Appellant] in 2007 and that Ms. Watts broke off the relationship sometime in March or April of 2008. She testified that Ms. Watts then began dating Mr. Palm. She testified that she was aware of the assault committed by [Appellant] on May 31, 2008. On the night of the assault, she met her sister at the hospital. After Ms. Watts was discharged, Ms. Harris accompanied her sister to the police station to file a report. She then accompanied Ms. Watts to obtain a Protection From Abuse order ("PFA") against [Appellant]. She became aware at some point that Ms. Watts did not proceed with the final PFA order due to an agreement between Ms. Watts and [Appellant] which involved the fact that Mr. Palm was facing assault charges for assaulting [Appellant]. [Appellant] and Ms. Watts agreed that Ms. Watts would terminate the PFA proceedings and [Appellant] would drop the assault charges against Mr. Palm.

Ms. Harris testified that she was with Ms. Watts a couple of days after [Appellant] assaulted [Ms.] Watts. While they were together, Ms. Watts received a text message from [Appellant] in which [Appellant] threatened to shoot Mr. Palm and Ms. Watts and then to put a bullet in his own head. Ms. Harris and Ms. Watts went to the police station to report the text message.

Jordan Palm, another of Dahl Palm's sons, testified that he was present when [Appellant] assaulted Ms. Watts at his father's garage. His testimony was consistent with the testimony of his brother. He testified that shortly after this incident, he was sitting with his father at the garage when his father received a phone call from [Appellant]. His father put the call on the phone's loud speaker and Jordan Palm heard [Appellant] tell Mr. Palm that he "was not just going to ride off into the sunset." [Appellant] specifically threatened to kill Mr. Palm, Ms. Watts and himself.

City of Pittsburgh Police Officer Deborah Stiokis testified that she was the officer who received the complaint made by Ms. Watts relative to the assault committed by [Appellant] on May 31, 2008. Officer Stiokis advised Ms. Watts to obtain a PFA order and she provided her with an informational sheet indicating how such an order could be obtained. Officer Glenn Aldridge also testified that he was at the police station on May 31, 2008 and he interviewed both Ms. Watts and Mr. Palm. After the interviews, he intended to obtain an arrest warrant for [Appellant]. Before he could obtain the warrant, Ms. Watts and Mr. Palm were murdered.

Curtis Tina Lockhart-Palm testified that she was the wife of Mr. Palm. She and Mr. Palm were separated. She testified that in June, 2008, [Appellant] telephoned her to discuss the relationship between Ms. Watts and Mr. Palm. [Appellant] appeared at Ms. Lockhart-Palm's place of employment and Mr. Palm appeared a short time later. An altercation ensued between [Appellant] and Mr. Palm. Police Officer Donald Mitchell testified that he responded to the incident described by Curtis Tina Lockhart-Palm. He testified that [Appellant] appeared to have received a broken jaw during the incident. He intended to arrest Mr. Palm but he was murdered before Officer Mitchell could arrest him.

Channing Buefort testified that he was a member of the same motorcycle club as [Appellant] and the victims. He testified that shortly before July 4, 2008, [Appellant] called him and asked if he could get [Appellant] a gun. Mr. Buefort was not able to fulfill the request but he referred him to another person, Warren Horton. Mr. Horton was a state constable. Mr. Horton testified that he received a telephone call from [Appellant] about three weeks before the murders seeking to join the Pittsburgh Chapter of the Brother of the Hammer Motorcycle Club because he was having some difficulties at the West End Chapter due to the relationship between the victims in this case. Mr. Horton testified that [Appellant] asked to purchase a gun from him. Mr. Horton offered to sell him a .38 caliber handgun for $350. Mr. Horton told [Appellant] that the sale had to be legal with all necessary paperwork. After [Appellant] heard these requirements, he asked Mr. Horton if he knew anyone else from whom he could purchase a gun.

Detective Terry Rediger from the Allegheny County Police Department testified about the crime scene. He testified that Ms. Watts was found lying on her back on the floor between the bed and a wall in the master bedroom and Mr. Palm was found lying on his back on the floor next to the other side of the bed. There was no sign of forced entry into the apartment. Spent .40 caliber bullet casings were found throughout the bedroom. Bullet holes were found in the floor of the bedroom and these holes corresponded to holes found in the ceiling of the basement.

Aaron Adams testified that Ms. Watts was his mother. He testified that he lived at his mother's residence at 1096 Valley Street. He testified that [Appellant] had a key to the residence. He testified that at the time of the murder[s], he was living at the residence along with Amber Durrett and her daughter Tijha, who were friends of Ms. Watts. He testified that he left the residence at approximately 1:30-2:00 a.m. on the date of the murder[s] to spend the night with a lady friend. He explained that the doors were locked when he left.

Regina Heckert testified that she lived at 705 Russellwood Avenue in McKees Rocks, Pennsylvania. Ms. Watts' apartment building was next to her backyard. Sometime around 4:00 a.m., she heard gunshots. She heard a series of gunshots, then a pause, then more gunshots. She looked out her window. There were streetlights that illuminated the area around the

apartment. She observed a person walking up Blumling Way, an alley next to the apartment. She noticed that the person was black. He was wearing a light colored short-sleeved shirt and was wearing dark shorts. She believed the shorts to be denim shorts. His hair was cropped, not long and not short. She described the person as being of medium height and stocky. She admitted that she did not see the face of the person but that it could have been [Appellant]. After the person disappeared, she heard a woman scream. Soon thereafter, police arrived on scene.

Amber Durrett testified that she was in the apartment on the night of the murders. She was sleeping in an adjacent room with her daughter when she was awakend by the gunshots. She grabbed her young daughter and retreated to a back room. She heard some shots then she heard Ms. Watts screaming "no, no, stop!" After the shooting stopped, she heard the kitchen door slam shut. She went into the master bedroom, which was filled with smoke. She saw Mr. Palm lying on the floor riddled with gunshots and bleeding. She fled the house with her daughter and got into her car. She drove around the corner and called the police. She had not seen Ms. Watts in the bedroom and initially feared that Ms. Watts shot Mr. Palm. She relayed her concerns to the police.

Leo Thomas testified in this case. He testified that on July 4, 2008, he noticed a car parked in front of his residence. This was unusual to him because cars were not often parked in that area. The car was [Appellant's] vehicle. He observed the car at approximately 4:00 a.m. In the early morning hours, he received a call from [Appellant's] brother indicating that [Appellant] may be a suspect in a homicide. Later that day, he interacted with [Appellant's] family and was asked to drive [Appellant] to downtown Pittsburgh so [Appellant] could turn himself in to police. When Mr. Thomas picked [Appellant] up, [Appellant] had a blank look on his face and appeared mentally "disheveled". On the ride to the police station, Mr. Thomas asked [Appellant] if he was okay. [Appellant] responded by saying "I'm okay now. They got what they deserved." According to Mr. Thomas, [Appellant] had an arrogant and boastful demeanor when he made those comments.

Detective Timothy Lanigan testified that he obtained samples from [Appellant] to perform gunshot residue testing of

[Appellant's] skin and clothing. He encountered [Appellant] around 11:00 a.m. on the day of the murders. Detective Lanigan testified that [Appellant] was wearing a dark blue pullover style shirt, a light-colored yellow t-shirt, denim shorts and white tennis shoes. Swabs of [Appellant's] hands were obtained as well as samples from his clothing. These swabs were submitted for gunshot residue testing. Detective Lanigan also testified that [Appellant] was arrested in May of 2010 and at that time [Appellant] was approximately 5'8" and weighed approximately 185 lbs. According to Detective Lanigan, [Appellant] was heavier on the date of the murder[s] than he was when he got arrested.

Robert Levine testified that he was employed by the Allegheny County Medical Examiner's Office and that among his duties are performing gunshot residue tests and ballistics examinations. He performed the gunshot residue testing on the sample taken from [Appellant] on July 4, 2008. Gunshot residue was found on [Appellant's] left palm. He also testified that all of the bullets fired from the shell casings found at the murder scene were fired from the same weapon.

Detective Scott Towne testified that he investigated whether [Appellant] has a license to carry a firearm on the date of the murders. He testified that [Appellant] did not have the appropriate license. Detective Towne also testified concerning cell phone records relating to [Appellant's] cell phone. Cell phone records indicated that [Appellant] made calls from his cell phone at 3:53 a.m. He made another call at 3:59 and 4:10 a.m. The murders occurred at 4:35 a.m. on July 4, 2008. Various other calls were made to [Appellant] by his daughter, Jaunel Jones between 5:00 a.m. and 6:00 a.m.

Elona Somple testified that she worked for the R.J. Lee Company. This company is in the business of testing evidence for the presence of gunshot residue. She testified that she tested [Appellant's] blue pullover, yellow t-shirt and denim shorts for the presence of gunshot residue. Ms. Somple testified that she received the clothing on July 30, 2008. The items were tested on August 7, 2008. All three elements of gunshot residue, antimony, barium and lead, w[ere] present on the denim shorts. Two of these elements were found on the yellow t-shirt and on the inside of the blue pullover [Appellant] was wearing on July 4, 2008.

[Appellant] presented a number of witnesses in his case-in-chief. Jessica Pluechel testified that she was with [Appellant] on July 3, 2008 and it was hot. She testified that she was taking care of him due to his broken jaw. She recalled him being pleasant on that day.

Juanel Jones testified for the defense. She is [Appellant's] daughter. She testified that [s]he called [Appellant] multiple times in the early morning hours of July 4, 2008 because she was afraid that the father of her baby was harassing her. She never spoke to [Appellant] but she left him messages. At approximately 6:30 a.m., [Appellant] came to her residence to stay with her. She was awakened later that morning by her brother who had called her to tell her that the police were looking for [Appellant]. She looked for [Appellant] in her residence but found that he was no longer there. On cross-examination, Ms. Jones was confronted with her grand jury testimony during which she denied calling [Appellant] or seeing him in the early morning hours of July 4, 2008. She repeatedly testified that she couldn't recall her grand jury testimony.

Wendell Jones, Sr. testified that he was [Appellant's] father. He testified that he, not Leo Thomas, drove [Appellant] to turn himself in on July 4, 2008.

[Appellant] testified at trial. He denied murdering the victims and he testified that a number of the Commonwealth witnesses were not telling the truth. He also testified that he was home alone at the time of the murder[s].

PCRA Court Opinion, 6/22/17, at 2-10.

A jury found Appellant guilty of two counts of first-degree murder,[1] one count of violating the Uniform Firearms Act ("VUFA"),[2] and one count of

_____

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 6106(a)(1).

burglary, graded as a felony of the first degree.[3] On the first-degree murder convictions, the trial court sentenced Appellant to two consecutive terms of life imprisonment. On the burglary conviction, the trial court sentenced Appellant to a term of ten to twenty years of imprisonment, consecutive to the sentences on the murder convictions. The trial court imposed no further penalty on the VUFA conviction.

Appellant failed to file a timely direct appeal. However, Appellant's appellate rights were reinstated nunc pro tunc on November 7, 2012. Appellant filed a timely appeal nunc pro tunc on November 28, 2012, and this Court affirmed Appellant's judgment of sentence. Commonwealth v. Jones, 105 A.3d 27, 1870 WDA 2012 (Pa. Super. Filed June 6, 2014) (unpublished memorandum). Appellant filed a timely petition for allowance of appeal to the Supreme Court of Pennsylvania on July 3, 2014, and the Supreme Court denied Appellant's petition on December 26, 2014. Commonwealth v. Jones, ___ A.3d ___, 313 WAL 2014 (Pa. 2014).

On December 22, 2015, Appellant, through counsel, filed a timely PCRA petition. In his PCRA petition, Appellant averred that his trial counsel was ineffective for failing to request an alibi instruction, a jury instruction concerning third-party liability, and a jury instruction regarding Appellant's prior inconsistent statement. PCRA Petition, 12/22/15, at ¶¶ 8-11. On April

_____

[3] 18 Pa.C.S. § 3502(c)(1).

5, 2016, the PCRA court informed Appellant of its intent to dismiss the PCRA petition without a hearing pursuant to Pa.R.Crim.P. 907. On April 25, 2016, Appellant filed a response to the PCRA court's notice of intent to dismiss, and on October 25, 2016, the PCRA court denied Appellant's PCRA petition. This timely appeal followed. Both Appellant and the PCRA court have complied with Pa.R.A.P. 1925.

On appeal, Appellant presents the following issues for this Court's consideration:

> I. Whether trial counsel was ineffective for failing to request a jury instruction on alibi and failing to object to the court's failure to provide such an instruction in its final charge to the jury?
>
> II. Whether trial counsel was ineffective for failing to request a jury instruction on the third-party culpability defense and failing to object to the court's charge omitting same?
>
> III. Whether trial counsel was ineffective for failing to request a specific jury instruction on Appellant's prior inconsistent statement to police that he was at his home when the murders were committed and that he didn't do it?

Appellant's Brief at 1.

When reviewing the propriety of an order denying PCRA relief, we consider the record "in the light most favorable to the prevailing party at the PCRA level." Commonwealth v. Stultz, 114 A.3d 865, 872 (Pa. Super. 2015) (quoting Commonwealth v. Henkel, 90 A.3d 16, 20 (Pa. Super. 2014) (en banc)). This Court is limited to determining whether the evidence of record supports the conclusions of the PCRA court and whether the ruling is free of legal error. Commonwealth v. Rykard, 55 A.3d 1177, 1183 (Pa.

Super. 2012). We grant great deference to the PCRA court's findings that are supported in the record and will not disturb them unless they have no support in the certified record. Commonwealth v. Rigg, 84 A.3d 1080, 1084 (Pa. Super. 2014).

We observe that each of Appellant's claims challenges the effective assistance of his trial counsel. Our Supreme Court has long stated that in order to succeed on a claim of ineffective assistance of counsel, an appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's performance lacked a reasonable basis; and (3) that the ineffectiveness of counsel caused the appellant prejudice. Commonwealth v. Pierce, 786 A.2d 203, 213 (Pa. 2001).

We have explained that trial counsel cannot be deemed ineffective for failing to pursue a meritless claim. Commonwealth v. Loner, 836 A.2d 125, 132 (Pa. Super. 2003) (en banc). Moreover, with regard to the second prong, we have reiterated that trial counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." Commonwealth v. Ervin, 766 A.2d 859, 862-863 (Pa. Super. 2000) (quoting Commonwealth v. Miller, 431 A.2d 233 (Pa. 1981)).

Our Supreme Court has defined "reasonableness" as follows:

> Our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the

alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis.

Commonwealth v. Pierce, 527 A.2d 973, 975 (Pa. 1987) (quoting Commonwealth ex rel. Washington v. Maroney, 235 A.2d 349 (Pa. 1967)) (emphasis in original).

In addition, we are mindful that prejudice requires proof that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. Pierce, 786 A.2d at 213. "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." Commonwealth v. Daniels, 963 A.2d 409, 419 (Pa. 2009) (citing Commonwealth v. Sneed, 899 A.2d 1067 (Pa. 2006)). Thus, when it is clear that a petitioner has failed to meet the prejudice prong of an ineffective-assistance-of-counsel claim, the claim may be disposed of on that basis alone, without a determination of whether the first two prongs have been met. Commonwealth v. Baker, 880 A.2d 654, 656 (Pa. Super. 2005).

It is presumed that counsel was effective, unless the petitioner proves otherwise. Commonwealth v. Williams, 732 A.2d 1167, 1177 (Pa. 1999). We are bound by the PCRA court's credibility determinations where there is support for them in the record. Commonwealth v. Battle, 883 A.2d 641, 648 (Pa. Super. 2005) (citing Commonwealth v. Abu-Jamal, 720 A.2d 79

(Pa. 1998)). Furthermore, claims of ineffective assistance of counsel are not self-proving. Commonwealth v. Wharton, 811 A.2d 978, 986 (Pa. 2002).

Additionally, we note that Appellant's issues involve the trial court's jury instructions. Our standard of review in assessing jury instructions is as follows:

> When evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

Commonwealth v. Roane, 142 A.3d 79, 95 (Pa. Super. 2016).

In his first issue on appeal, Appellant avers that trial counsel was ineffective for failing to request a jury instruction on alibi and failing to object when this instruction was not provided. Appellant's Brief at 7. We discern no error of law.

> An alibi is "a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." [Commonwealth v. Roxberry], 602 A.2d [826,] 827 [(Pa. 1992) (Roxberry II)] (quoting Commonwealth v. Jones, 529 Pa. 149, 602 A.2d 820, 822 (1992)). In Commonwealth v. Pounds, [417 A.2d 597 (Pa. 1980),] we held that a trial court, faced with alibi evidence,[3] should instruct a jury generally that "it should acquit if defendant's alibi evidence, even if not wholly believed, raises a reasonable doubt of his presence at the scene of the crime at the time of its commission and, thus, of his guilt." [Pounds, 417 A.2d at 603]. The instruction,[4] we held, is critically important to offset "the danger that the failure to prove the defense will be taken by the

- 12 -

jury as a sign of the defendant's guilt." Id. We explained that the defendant bears no burden of proof in a criminal case, and that to infer guilt based upon a failure to establish an alibi "contravenes the presumption of innocence and the Commonwealth's burden of proving the offense beyond a reasonable doubt." Id. at 603 n. 17. Given these concerns, we have held unequivocally that "a defendant is entitled to an alibi instruction when evidence of alibi … has been introduced." Id. at 602 (citing Commonwealth v. Bonomo, 396 Pa. 222, 151 A.2d 441 (1959)). Further, we held in Pounds that "general instructions on the Commonwealth's burden of proving each element of the offense beyond a reasonable doubt, the absence of a burden of proof on the defendant, and assessing the credibility of witnesses do not adequately protect against" the danger posed by the misapprehensions a jury might indulge regarding the relevance and effect of alibi evidence. Id. at 603.

[3] Although an alibi defense typically is presented with accompanying testimonial or other evidence, "the testimony of the accused may, by itself, be sufficient to raise an alibi defense and entitle him to an appropriate jury instruction." Pounds, 417 A.2d at 602.

[4] A model alibi instruction follows:

In this case, the defendant has presented evidence of an alibi, that is, that [he] was not present at the scene or was rather at another location at the precise time that the crime took place. You should consider this evidence along with all the other evidence in the case in determining whether the Commonwealth has met its burden of proving beyond reasonable doubt that a crime was committed and that the defendant [himself] committed or took part in committing] it. The defendant's evidence that [he] was not present, either by itself or together with other evidence, may be sufficient to raise a reasonable doubt of [his] guilt. If you have a reasonable

- 13 -

> doubt of the defendant's guilt, you must
> find [him] not guilty.
>
> Pa. Suggested Std. Crim. Jury Instr. § 3.11.
> Although courts are not bound to utilize this precise
> instruction, see Commonwealth v. Ragan, 560 Pa.
> 106, 743 A.2d 390, 399 (1999) (declining to require
> use if the "even if not wholly believed" language
> used in Pounds); cf. Commonwealth v. Blount,
> 538 Pa. 156, 647 A.2d 199, 209 (1994) ("The trial
> court has discretion in phrasing its instructions to the
> jury ...."), an alibi instruction should simply "indicate
> that the failure of the evidence to prove alibi is not
> evidence of guilt, that the defendant bears no burden
> to disprove any element of the offense, and alibi
> evidence may negate proof beyond a reasonable
> doubt even if it is not wholly believed...." Pa.
> Suggested Std. Crim. Jury Instr. § 3.11, Adv. Comm.
> Note.

Commonwealth v. Hawkins, 894 A.2d 716, 717-718 (Pa. 2006) (internal citations omitted).

However, the failure to request an alibi instruction does not constitute prejudice per se. Hawkins, 894 A.2d at 729. Thus, Appellant remains responsible to establish that counsel had no reasonable basis for his failure to request the alibi instruction and that he was prejudiced. Id.; Pierce, 786 A.2d at 213.

The record reveals that Appellant testified at trial that he was alone in his home watching television at the time of the murders. N.T., 7/22-26/11, at 390. Thus, Appellant argues that his testimony established that he could not have committed the crimes and an alibi instruction was required. Appellant's Brief at 5. While Appellant did in fact claim he was not at the

crime scene, we cannot conclude that the failure to request an alibi instruction or object to the trial court's failure to give such instruction was without a reasonable basis or prejudicial.

Here, the notes of testimony reveal that counsel had a reasonable basis for not pursuing an alibi defense. Counsel stated that he believed that alibi was a weak defense because no one could corroborate the alibi. N.T., 8/24/16, at 17. Counsel testified that he believed the better strategy was to establish that another individual committed the crime. Id. at 18.

Moreover, there was ample evidence establishing that Appellant was the perpetrator of the crimes. A prior panel noted as follows:

> Detective Terry Hediger testified that there was no sign of forced entry at the crime scene. See N.T., Trial, 7/20/2011, at 339. Watts's son, Aaron Adams, testified that [Appellant] had a key to Watts's residence. See id., at 393. Adams also testified that he had locked the doors to his mother's residence when he left at 2 a.m., approximately two hours before the crime occurred. See id., at 398–399. This evidence, taken together, was sufficient to establish that [Appellant] was one of a small group of likely suspects that had access to Watts's residence without breaking in.

> Furthermore, a neighbor, Regina Heckert, testified that she heard gunshots around 4 a.m. on the night of the crime. See id., at 412. After hearing the gunshots, she looked out her window and observed a dark-skinned male walking down the alley next to Watts's residence. See id., at 421. The male had on a light-colored t-shirt and dark shorts. See id., at 421–422. He had short hair. See id. He was of medium height with a stocky build. See id., at 425. She did not see any firearm visible on his person. See id., at 425–426.

> Detective Timothy Lanigan testified that he met with [Appellant] later that same morning, at approximately 11:00 a.m. See N.T., Trial, 7/21/2011, at 600. [Appellant] was

wearing a dark blue pullover shirt over a yellow t-shirt and blue denim shorts. See id., at 603. When [Appellant] was subsequently arrested, he was measured as being 5 8  tall, and weighed 185 pounds. See id., at 616.

Detective Lanigan also testified that he tested [Appellant's] hands for gunshot residue. See id., at 602. The swabs of [Appellant's] left palm tested positive for gunshot residue. See N.T., Trial, 7/22/2011, at 31. Furthermore, gunshot residue was found on [Appellant's] clothing. See, N.T., 7/25/2011, at 266.

Jones, 105 A.3d 27, 1870 WDA 2012 (unpublished memorandum at *8-9).

Additionally, at the PCRA hearing, the PCRA court discussed the absence of prejudice and the weakness of an alibi defense in Appellant's case:

THE COURT: To me, that's the meat of your argument because the jury was instructed to weigh the evidence and testimony of all witnesses, and that included [Appellant] who did testify. The jury wasn't specifically told that includes [Appellant] and quite that way because, to me, that would not be proper, but they were instructed to determine the credibility of all witnesses and to weigh the evidence, and so, [Appellant's] testimony would have been included in that, and though there was not a specific alibi instruction given, [Appellant's] testimony was, I was home. And if the jury found his testimony credible, they'd have a problem to find him guilty beyond a reasonable doubt since they believed he was home. How could he have done it.

So my view, Mr. Eyster [(counsel for Appellant)], is that as to that argument, perhaps it might have been better had an alibi instruction been given, but the lack of one in the circumstances of this case where other witnesses were not called to say, wait, [Appellant] was with me, it was [Appellant] himself testifying, I didn't do it, I was home.

The jury was told to evaluate that evidence with all the other evidence. I don't see that he suffered prejudice warranting a new trial for the failure of a specific alibi instruction.

N.T., 8/24/16, at 43-44.

The PCRA court succinctly addressed this issue in its opinion as follows:

> This Court does not believe that [Appellant] can overcome the presumption that trial counsel rendered effective assistance of counsel nor does the record reflect that [Appellant] was prejudiced by counsel's failure to request the jury instructions he now advances. [Appellant's] first claim is that trial counsel should have requested an alibi instruction because [Appellant] testified at trial that he was at his home alone on the evening of the murder[s], July 3, 2008, watching television. He testified that he w[oke] up at 6:00 a.m. on the morning of July 4, 2008 and went to his daughter's house. This Court agrees that, if believed, [Appellant's] testimony would have constituted an alibi. However, this Court simply does not believe that there is a reasonable probability that the result of the trial would have been different has an alibi instruction been read to the jury. [Appellant] clearly testified at trial as to his location at the time of the murder[s] and he denied committing the murder[s]. The jury obviously rejected this testimony when it convicted [Appellant]. There is no reason to believe that, had the jury been instructed that this testimony, if believed, would constitute an alibi, the verdict would have been different. Accordingly, this claim fails.

PCRA Court Opinion, 6/22/17, at 12.

We agree with the PCRA court's conclusion. While Appellant may have been arguably entitled to an alibi instruction, Appellant cannot prove that, had the instruction been given, the result of the trial would have been different. Pierce, 786 A.2d at 213. Accordingly, we discern no error of law in the PCRA court's determination.

Next, Appellant alleges that trial counsel was ineffective for failing to request a jury instruction on the third-party culpability defense and failing to

object when the trial court did not provide this instruction. Appellant's Brief at 9. We conclude that no relief is due.

Foremost, we point out that there is no "third-party culpability" jury instruction in Pennsylvania. However, we concede that it would have been possible for Appellant's trial counsel to have crafted such an instruction and proposed it to the trial court. Nevertheless, the evidence admitted at Appellant's trial would not support such an instruction as there was no evidence that a third-party committed the crimes.[4] It is well settled that jury instructions concerning matters that are not before the court or which are not supported by the evidence serve no purpose other than to confuse the jury. Commonwealth v. Patton, 936 A.2d 1170, 1176 (Pa. Super. 2007) (citations omitted). Thus, despite counsel's trial strategy and desire to place the blame on a third-party, N.T., 8/24/16, at 18, there was no supporting evidence of this theory. Id. at 51-52. Because there was no evidence, counsel cannot be deemed ineffective for failing to craft and present such a jury instruction to the trial court as the underlying claim is of no merit. See Commonwealth v. Treiber, 121 A.3d 435, 445 (Pa. 2015) ("[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.").

_____

[4] Moreover, Appellant has failed to direct our attention to where evidence of a third-party's involvement in the crimes appears in the record. The PCRA court noted that Appellant's argument regarding the involvement of a third party was speculation. N.T., 8/24/16, at 51-52.

Finally, Appellant claims that trial counsel was ineffective for failing to request a jury instruction regarding Appellant's prior inconsistent statement to police that he was at his home when the murders were committed and that he did not commit the crimes. No relief is due.

At the outset, it is evident that Appellant is in fact arguing for an instruction regarding his prior "consistent" statement and not a prior "inconsistent" statement. Appellant's Brief at 10. It is undisputed that Appellant informed investigating officers that he was at home at the time of the murders. N.T., 7/22-26/11, at 386-390. In his brief, Appellant merely asserts that "Had the trial court highlighted Appellant's prior consistent statement in its instructions, the jury would have been aware of the significance of Appellant's prior consistent statement, which would have provided a reasonable probability that the result would have been different." Appellant's Brief at 10-11. Appellant's argument on this issue is undeveloped, and this conclusory and self-serving averment fails to satisfy the requirements of the Pierce test for ineffectiveness. See Commonwealth v. Natividad, 938 A.2d 310, 322 (Pa. 2007) ("An undeveloped argument, which fails to meaningfully discuss and apply the standard governing the review of ineffectiveness claims, simply does not satisfy Appellant's burden of establishing that he is entitled to any relief.") (citations omitted). Additionally, we are constrained to point out that the trial court did instruct the jury on prior inconsistent statements, prior

consistent statements, and how such statements may be weighed in deliberations concerning credibility. N.T., 7/22-26/11, at 593-594.

For the reasons set forth above, we conclude that Appellant is entitled to no relief. Accordingly, we affirm the order denying Appellant's PCRA petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/19/2017